## HAWAIIAN EQUIPMENT CO., LIMITED, v. EIMCO CORPORATION.

No. 7188.   Decided June 24, 1949.   (207 P. 2d 794.)

Rehearing Denied September 14, 1949.

See 37 C. J. S., Frauds, Statute of, sec. 197.

*Jesse R. S. Budge,* Salt Lake City, *Willis W. Ritter,* Salt Lake City, for appellant.

*Ingebretsen, Ray, Rawlins & Jones,* Salt Lake City, *C. E. Henderson,* Salt Lake City, *W. W. Ray,* Salt Lake City, for respondent.

LATIMER, Justice.

This is an action for damages arising out of an alleged breach of contract. Appellant prosecutes this appeal from a money judgment in favor of respondent. The cause was tried before a jury in the court below and while we quote portions of the disputed evidence, for the purposes of this decision we are required to view the evidence from the standpoint most favorable to respondent.

Respondent, a corporation, is domiciled in Honolulu, Hawaii, and has for its principal business the exclusive dealership throughout the territory of Hawaii of certain machinery and equipment manufactured in the continental United States. One of the manufacturers it represented was appellant. In the summer of 1946 respondent's officers learned that quantities of chipping and scaling hammers located in Hawaii were being offered for sale by the Federal Government as surplus property. Respondent found there was no market for these tools in Hawaii and began to investigate the possibilities of contacting a purchaser who might be interested in marketing the hammers in the United States. Samuel T. Dickey, respondent's San

Francisco representative, contacted Joseph Rosenblatt, appellant's president and general manager, by telephone, and informed him that the Government had placed the tools on sale and asked whether he would be interested in their acquisition. Mr. Dickey's testimony concerning Mr. Rosenblatt's reply was merely that he would take the matter under advisement. Mr. Rosenblatt testified that he told Mr. Dickey that appellant, itself, would not be interested in the hammers inasmuch as it was only interested in the manufacture and sale of its own products, but that he thought he had a friend who might be interested in the sale. This part of Mr. Rosenblatt's testimony was denied by Mr. Dickey. The next day, Mr. Rosenblatt telephoned Mr. Dickey and again there are two versions of what was said in that conversation. Mr. Dickey's testimony was that Mr. Rosenblatt said he was interested in purchasing the entire quantity of tools being offered by the government; that he offered to pay respondent fifty-five per cent of their original cost; and that he requested Mr Dickey to transmit that information to respondent's Honolulu office. Mr. Rosenblatt testified he merely told Mr. Dickey that his friend was interested in the tools and had requested full details of the Government sale.

Mr. Dickey cabled Malcolm MacNaughton, respondent's president, informing him that appellant had offered to buy the entire stock of hammers at fifty-five per cent of the original cost to the government. On August 5, 1946, Mr. MacNaughton telephoned Mr. Rosenblatt from Honolulu and the witnesses again disagree as to what each said to the other. Mr. MacNaughton testified he told Mr. Rosenblatt that respondent had received word of appellant's interest in acquiring the hammers as well as the price it had indicated to respondent's San Francisco representative it would be willing to pay; that respondent could not take a price indication through the San Francisco office as a firm bid for the equipment and that he, Mr. MacNaughton, was telephoning so that Mr. Rosenblatt could confirm the bid

he had previously made; that Mr. Rosenblatt then confirmed this bid at fifty-five per cent of the cost to the government; that he, Mr. MacNaughton, then explained respondent's plan of operation to be that respondent wanted a firm bid from appellant; that if a firm bid was made and if respondent could purchase the tools from the government for less than that price, it would do so and the difference between the two prices would represent respondent's profit; that Mr. Rosenblatt said this arrangement was satisfactory to appellant and that he would confirm the price by cable. Mr. Rosenblatt's version of this telephone conversation was that respondent made no offer to sell the tools to appellant and that he (Rosenblatt) said nothing to indicate that appellant would take them; that he told Mr. MacNaughton the offering looked good; that he would talk to his friend (Weinberg of Brown-Bevis Company) and cable respondent a figure to bid. Jack Blades, respondent's sales engineer and an acquaintance of Mr. Rosenblatt, also participated in this telephone conversation by giving Mr. Rosenblatt information regarding the makes, models, approximate number and condition of the hammers involved in the offering. He testified he told Mr. Rosenblatt the tools were brand new and that the makes involved included Ingersoll-Rand, Master, Thor, and Chicago Pneumatic; that the ones inspected were all standard brands; and that Mr. Rosenblatt had replied that so long as the tools were standard makes, the brand was probably all right. Mr. Rosenblatt's version of this part of the telephone conversation was that Mr. Blades had informed him that the tools were ninety per cent Ingersoll-Rand and ten per cent Thor; that he had replied that this sounded like a choice offering; and that he would talk to the Brown-Bevis Company and cable respondent a figure to bid.

On August 8, 1946, appellant sent respondent the following message by cablegram:

"Hawaiian Equipment, Honolulu

"Reference hammers bid maximum 24 dollars each scalers 17.50 each Honolulu will take all          "Eimco"

On the same day, Mr. Rosenblatt mailed a letter to Mr. Blades in Honolulu indicating that appellant had no interest in the transaction, but that the Brown-Bevis Company alone was handling the matter. This letter was sent by air mail, but was received after respondent's purchase order had been accepted by the government.

On August 9, 1946, respondent sent the following cablegram in reply to appellant's cablegram:

"Joseph Rosenblatt
"The Eimco Corporation
"Salt Lake City, Utah

"In accordance your cable Hawaiian Equipment Company sells you subject delivery from surplus approximately 992 chipping hammers 1836 scaling hammers 24 dollars and 17 dollars each respectively fob Honolulu preparing for shipment soon as possible will advise.

"MacNaughton"

Later the same day respondent cabled this additional message to appellant:

"Joseph Rosenblatt,
"The Eimco Corporation,
"Salt Lake City, Utah.

"Regret typographical error in cable scaler price should be 17.50 each Honolulu per your cable and not 17.

"MacNaughton"

On August 23, 1946, appellant cabled respondent stating that it had no interest in the matter and instructed respondent to take up the question of the sale of the tools with Weinberg of Brown-Bevis Company. Thereafter, respondent, in endeavoring to sell the tools, advertised their sale in publications, having nation-wide circulation, and after giving notice to appellant that the tools were to be sold, respondent made a sale to the highest bidder.

After the taking of evidence was completed both parties made motions for directed verdicts. One of the grounds assigned by appellant was that assuming a valid contract of purchase and sale to exist between the parties, there

was no written memorandum or note thereof sufficient to satisfy the Statute of Frauds.

The court denied both motions and in instructing the jury on the issues involved, informed the jurors that the parties had entered into a legal contract for the sale and purchase of the hammers. An exception to this specific instruction was not taken by the appellant and no assignment of error in this court questions its validity, but appellant did assign as error the failure to direct a verdict. In support of this assignment appellant asserts that the trial court was in error in finding a legal contract, apparently, for the reason that the initiatory telegram sent by appellant did not satisfy the requirements of the Statute of Frauds, and accordingly, no enforceable contract, oral or written, was established.

In view of the assignment and the arguments made, we conclude to pass on the assigned error as presented and determine the sufficiency of the telegram to meet the requirements of Section 81-1-4, U. C. A. 1943. This statute, in substance, provides that any contract for the sale of goods of a value of $500.00 or more shall be unenforceable unless a note or memorandum in writing of the contract is signed by the party to be charged, or his agent.

Restatement of the Law, Contracts, Section 207, sets forth the general requirements of a memorandum. This Section is as follows:

"A memorandum, in order to make enforceable a contract within the Statute, may be any document or writing, formal or informal, signed by the party to be charged or by his agent actually or apparently authorized thereunto, which states with reasonable certainty,

"(a) each party to the contract either by his own name, or by such a description as will serve to identify him, or by the name or description of his agent, and

"(b) the land, goods or other subject-matter to which the contract relates, and

"(c) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made.
"Comment:

"a. A written memorandum of a contract is not identical with a written contract. A written contract will indeed serve as a memorandum, but a memorandum includes also any writing which states the terms agreed upon, though not intended or adopted by the parties as a final complete statement of their agreement. The degree of particularity with which the terms of the contract, the names or descriptions of the parties must be set out cannot be reduced to an exact formula. There must be 'reasonable' certainty and there must be accuracy, but the possibility need not be excluded that some other subject-matter or person than those intended will also fall within the words of the writing."

Appellant makes no contention that the requirements of subsection (a) have not been met with certainty. Its criticism is directed to the uncertainty in connection with the other requirements.

The principle that the goods must be identified and the other terms and conditions set forth with reasonable certainty, must be considered in connection with the knowledge and relationship of the parties and trade usages to determine whether the contents of the memorandum sufficiently conveyed to the parties involved an identity of the subject-matter and a reasonable certainty of the other terms and conditions. The means used to transmit the offer in the case at bar was one of common usage and one in which brevity is desirable. The parties represented business interests which were familiar with the articles being sold and they understood the meaning to be given the words "hammers" and "scalers." The use of the abbreviated phrase "reference hammers" presupposed some prior discussion with reference to hammers. While the use of abbreviated phrases may render the writing unintelligible to an uninstructed person, the phrase may still have meaning when viewed in the light of circumstances surrounding the sending of the cablegram. When this court scrutinizes the language of the cablegram, it gives to the words used the meaning ascribed to them by merchants who are familiar with their usage and have occasion to deal with them in the commercial world. If, by

giving the words such meaning, the subject-matter is intelligently identified and the terms and conditions are fairly disclosed, then parol evidence is admissible for a limited purpose. While this type of evidence is not competent to contradict or vary the terms of a memorandum to show what is intended, the situation of the parties and the surrounding circumstances at the time the contract was made, may be shown by such proof to apply the memorandum to the subject matter. The cablegram is not so lacking in details as to amount to a nullity and when it is interpreted in the light of the surrounding facts and circumstances, any deficiencies are supplied and the instrument then becomes certain in all of its terms. The conditions are not changed or modified; they are explained and the explanation makes it possible to determine from the cablegram what appellant was offering to purchase. The cablegram, even though not a model of clarity, was sufficient to fully disclose the essential terms of the offer and parol evidence was admissible for the purpose of applying the terms of the cablegram to the sale of the hammers.

The cablegram having been properly admitted in evidence, do the facts and circumstances surrounding its sending, establish a definite offer to purchase? Although the goods were merely described as "hammers" and "scalers" each party in effect concedes that these terms of the cablegram were understood by them to refer to "chipping hammers" and "scaling hammers." The point on which the parties divide is the uncertainty concerning the make, model, and number of each kind of hammer involved in the contemplated purchase. Although the testimony on behalf of the parties on the question of the makes involved in the government offering is in direct conflict, the jury resolved this evidence in favor of the respondent and found that the tools were substantially as represented. The sale being by lot rather than by individual description, the evidence concerning identification was sufficient to remove any uncertainty about the make or model.

Similar reasoning applies to the claimed uncertainty of the cablegram with respect to the quantity of hammers to be purchased. The memorandum states that appellant "will take all". The record discloses that appellant had been informed that there were between 2600 and 2800 tools being offered by the United States Government as surplus property and that they were boxed and located in government warehouses in Honolulu. The word "all" clearly refers to all scaling and chipping hammers being offered for sale at Honolulu at that time by the government. The approximate number of hammers and their location were known and fully explained to appellant's president. These were the only tools ever discussed in the various conversations between the parties, and under these circumstances, there can be no doubt that they intended to deal with only the hammers and scalers that were then and there being offered for sale by the government. The number sold to appellant was well within the limits suggested in the conversations between the parties and the effect of the phrase was to permit the respondent some reasonable latitude in the number it could buy from the government and resell to the appellant.

A more serious question is raised by appellant's contention that the words "reference hammers bid maximum", when given their ordinary meaning, cannot be construed in such a manner as to make the telegram an offer to buy from respondent but must be interpreted as only designating respondent as an agent to act for appellant. We quote the issue as stated in appellant's brief:

"The phrase 'bid maximum' bears no other reasonable construction than that it authorizes respondent to bid on behalf of appellant and to obtain the property not specifically identified as cheaply as possible but in no event to bid above the maximum price quoted."

Appellant argues that had it intended its cablegram as an offer to buy, it would have omitted the word "maximum" leaving the message to read: "Reference hammers bid 24 dollars each scalers 17.50 each, etc."; but that the use of

the word "maximum" indicates that appellant only intended to authorize respondent to bid for it as its agent at prices not to exceed twenty-four dollars for chipping hammers and seventeen dollars and fifty cents for scaling hammers.

There is a certain ambiguity about the phrase "bid maximum" and so in endeavoring to ascertain the meaning to be given to the words, we look not only to the language itself but to the acts and conduct of the parties. Where the language used is susceptible of more than one interpretation, we attempt to interpret the wording as the parties used it, by placing ourselves as nearly as possible in the situation of the parties at the time the cablegram was prepared. The language used in the instrument should be construed in the light of the facts surrounding and leading up to the written memorandum. *Read v. Forced Underfiring Corporation*, 82 Utah 529, 26 P. 2d 325; *Fox Film Corporation* v. *Ogden Theater Co.*, 82 Utah 279, 17 P. 2d 294, 90 A. L. R. 1290. Testimony on behalf of respondent indicates that S. T. Dickey, as respondent's San Francisco representative, called Joseph Rosenblatt, president of appellant on August 1, 1946, and informed him that War Assets in Hawaii had placed the tools in question on sale and asked him whether he would be interested in their acquisition; that Mr. Rosenblatt replied he would take the matter under advisement; that the next day, August 2, 1946, Mr. Rosenblatt telephoned Mr. Dickey to inform him that appellant was interested in purchasing the entire quantity of tools at fifty-five per cent of their cost to the Government and requested that this information be transmitted to respondent's Honolulu office; that the message was cabled to Mr. MacNaughton, respondent's president, who on August 5, 1946 telephoned Mr. Rosenblatt from Honolulu and asked for a confirmation of the bid made to Mr. Dickey; that Mr. MacNaughton explained that he wanted Mr. Rosenblatt to give them a positive bid and that if respondent was able to buy the tools for less, they would do so and their profit would represent the difference

in price; that Mr. Rosenblatt agreed to this and Exhibit A is the cablegram appellant sent August 8, 1946 to comply with Mr. MacNaughton's request. Mr. Rosenblatt, testifying for appellant, admitted having had the various conversations with Mr. Dickey and Mr. MacNaughton but testified he had informed them both that appellant would not be the purchaser, but that the tools would be bought, if at all, by another corporation.

There is no evidence in the record indicating that respondent was ever informed that it was acting as an agent for appellant. It had not acted as a purchasing agent for appellant prior to this time and unless respondent was to purchase the tools from the government and resell them to appellant, no provisions were made for compensation of the agent. Respondent's insistence on a firm bid is more consistent with a contract of purchase and sale than with the establishment of an agency relationship. Assuming Mr. Rosenblatt told Mr. MacNaughton that appellant was acting for another, that would establish nothing concerning whether respondent was acting as a vendor to or as an agent for appellant. Such being the case, there is nothing to indicate that respondent was to act in the capacity of an agent for appellant apart from a possible interpretation of the words "bid maximum" to that effect. According to Mr. Rosenblatt's versions of the conversations, and from his subsequent communications, Eimco never intended to be a purchaser of the equipment as principal or otherwise, and never entered into a contract of any kind with respondent.

Words and phrases should be construed to be consistent with the intention of the parties as evidenced by their declarations, acts and conduct at the time of the transaction. The record shows that appellant did not interpret the cablegram to create a relationship of principal and agent between itself and respondent until the cause was submitted to the court below. Respondent never did so construe it. The intention of the parties

must be determined at the time of the transaction and not at a time subsequent thereto. Accordingly this assignment of error is not well taken.

Appellant next contends that there was no meeting of the minds of the parties by arguing that even if we should decide that the words "bid maximum" cannot be reasonably construed only as an authorization to bid for and on behalf of appellant, the words are susceptible of that ▆▆▆▆ interpretation; that appellant had a right to attach such meaning to the words; and that if respondent elected to treat the cablegram as an offer to buy, no contract could result because the parties were not in accord. When both parties are justified in placing different interpretations upon the language used, obviously there is no contract. But the operation of the principle has its limitations. Where the language used is susceptible of more than one interpretation, it will be construed most strongly against the person using it. *Read* v. *Forced Underfiring Corp.*, supra; *Miffin* v. *Shiki*, 77 Utah 190, 293 P. 1; *Penn Star Mining Company* v. *Lyman*, 64 Utah 343, 231 P. 107. The reason for the rule is expressed in 17 C. J. S., Contracts, § 324, p. 751 as follows:

"* * * a man is responsible for ambiguities in his own expressions and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the court will adopt a construction by which they would mean another thing more to his advantage."

There is much to be said in this case for the application of this rule to prevent appellant from asserting that it should escape liability on the theory that there has been no meeting of the minds of the parties. The cablegram is brief and when viewed under the facts surrounding the sending of it, we believe the respondent was entitled to believe appellant extended an offer to buy even if appellant subjectively intended merely to thereby establish an agency.

Appellant asserts that even under the view we have adopted concerning the effect to be given its cablegram

to respondent, viz. that it was an offer to buy, there is still no contract between the parties because respondent's purported acceptance is clearly conditional. To support its argument appellant refers to that portion of respondent's first cablegram to appellant which reads:

"Hawaiian Equipment Company sells you *subject delivery from surplus* etc." (Italics ours.)

That an acceptance which imposes terms or conditions not present in the offer has no validity and that its only recognition is as a counter-offer is well settled but under the facts of the instant case the words "subject delivery from surplus" cannot operate as imposing a new condition in the contract. The testimony of the witnesses for both litigants discloses that they all understood the government owned the tools and that respondent could only sell them to appellant after purchasing them from the government. The offer was to buy all hammers to be delivered by the government from surplus and the acceptance was to sell all hammers so delivered. Under these circumstances, the recital that the sale is subject to delivery from surplus imposes no new condition upon the contract but only recites what both parties knew and understood. We find the rule applicable in the instant case aptly stated by Professor Williston in Vol. I, Section 78 of the Revised Edition of his work on Contracts as follows:

"Sometimes an acceptor from abundance of caution inserts a condition in his acceptance which merely expresses what would be implied in fact or in law from the offer. As such a condition involves no qualification of the acceptor's assent to the terms of the offer, a contract is not precluded."

Under these circumstances the recital complained of does not render respondent's acceptance conditional.

The judgment is affirmed. Costs to respondent.

WOLFE and McDONOUGH, JJ., concur.

PRATT, Chief Justice (dissenting).

In the argument and discussion of this case there has developed a confusion of principles of law which should be clarified, even though some of the results are not before us as issues upon this appeal.

When we discuss the sufficiency of a memorandum under the Statute of Frauds, we are discussing an oral contract and not a written contract. The following quotation from the case of *Standard Oil* v. *Koch,* 260 N. Y. 150, 183 N. E. 278, 279, is illustrative of this thought:

"Except as evidence of the oral contract, the memorandum has no force or effect unless and until the oral contract has been established by a preponderance of evidence. Then, if accurate and complete, it prevents the interposition of the Statute of Frauds as a bar to the enforcement of the oral contract."

See also: Williston on Contracts, Rev. Ed. Vol. II, Sec. 567, note 8, page 1618. In our general Statute of Frauds this seems obvious as that statute includes this expression:

"* * * unless such agreement, or some note or memorandum thereof is in writing subscribed by the party to be charged."

In other words, there are two contingencies either of which removes the contract from under the bar of the statute— (1) The agreement is in writing, or (2) The agreement is oral, but evidenced by a note or memorandum in writing signed by the party to be charged. See Section 33-5-4, U. C. A. 1943. Section 81-1-4, U. C. A. 1943, involved in this action, is part of our Sales Code. It says nothing about an agreement in writing, but uses only the expression as to the note or memorandum. Section 81-1-3, however, provides that sales contracts may be in writing or may be oral, or may be partly written and partly oral. Of course, if a contract is in writing, signed by the party to be charged, then there need be no memorandum also signed by the party to be charged to evidence it.

We should not overlook the fact that where the question is one of mutual assent, we are faced with the question

of whether or not all the elements of a contract are present. A general denial to a complaint alleging a contract raises the issue of the existence of each of the elements. On the other hand, the defense of the Statute of Frauds as a bar to recovery on the contract is an affirmative defense, and admits the existence of those elements, but denies their effectiveness upon the ground that they have not taken the proper written form. In effect, then, the Statute of Frauds deals primarily with the law of evidence; while mutual assent deals primarily with the substantive law of contracts —those rules which give recognition to the foundation of rights and duties.

Plaintiff's (respondent's) complaint is founded upon a written contract—it alleges a written contract made up of two cablegrams, an offer cablegram of August 8, which is, as a matter of fact signed by the party to be charged; and an acceptance cablegram of August 9, signed by the offeree. We are not concerned with any question of the sufficiency of a memorandum signed by the party to be charged to evidence the terms and the parties of an oral contract. If these two cablegrams evidence a binding contract, it is a written contract, not an oral contract. If these two writings evidence mutual assent, there is a written contract. If they do not evidence mutual assent, then there is no contract so far as this case is concerned as no one is suing on an oral contract. It is, in determining the question of mutual assent, that the meaning of the terms of the alleged written offer and of the alleged written acceptance are subject to explanation by parol evidence if those terms are uncertain or ambiguous.

Obviously if that cablegram is ambiguous in its terminology as an offer, we must look to the oral testimony to identify or explain the meaning of the terms of the written offer—but not to expand its scope. If it develops that the parties are talking at cross-purposes there is no mutual assent, and no contract.

The offer cablegram standing alone is capable of two interpretations—an agency direction, or an offer to purchase. The evidence upon this point is in conflict and raises an issue of fact. The Eimco witness contends that it is a direction; the Hawaiian Company witness claims it is an offer to purchase. In the lower court the defendant (appellant) requested instructions to the jury upon this issue which was one of mutual assent. No doubt this was in accord with the following principles found in 53 Am. Jur. 218, Sec. 258:

"* * * The general conclusion to be drawn from the cases is that where all of the matters relied upon as constituting a contract appear either wholly from writings which may be understood without reference to parol evidence, or from such writings and from parol evidence which admits of but one construction, it is for the court to say whether a contract is shown, but that where proof of any of the factual elements of the alleged contract is made wholly or partly by parol, either because the writings relied upon are obscure or ambiguous, or because they are incomplete, and such parol evidence is subject to opposite conclusions or inferences as to the existence of any essential element of the contract, it is for the jury to draw such conclusions or inferences, perhaps indicating their decision by a determination under appropriate instructions as to whether or not a contract existed. * * *"

The lower court decided this issue of fact however; but this is not assigned as error here.

The appellant assigns six errors:

(1) The admission of the offer cablegram.

(2) The admission of the acceptance cablegram.

(3) The admission of the cablegram of correction of the offer.

(4) The admission of the confirmation letter.

(5) Failure to direct a verdict for defendant (appellant).

(6) Failure to grant defendant (appellant) a new trial.

One of these is sufficient, if an error, to be fatal to the lower court's judgment.

In discussing the effect of the acceptance cablegram of August 9, appellant raises the issue of its being conditional. Reference is made to the phrase (italicized for this opinion) in the following quotation of that acceptance:

"In accordance your cable Hawaiian Equipment Company sells you *subject delivery from surplus* approximately 922 chipping hammers 1836 scaling hammers 24 dollars and 17 dollars each respectively fob Honolulu preparing for shipment as soon as possible. Will advise. MacNaughton." (Italics added.)

Respondent seeks to meet this argument by stating in effect that it was implicit in the dealings of the parties that the sale was contingent upon delivery from the Government—that the offer was made with that understanding. To expressly state a condition which without its being expressed would be implied in law, does not make an acceptance conditional. Such is not this case, however. The witness MacNaughton, for plaintiff, testified that upon receipt of the offer cablegram of August 8, he called the Government representative to buy the tools and was told to bring his check over and he could have them. Following this, the next day, August 9, the acceptance cablegram was sent. Under such circumstances, it seems strange to argue that the implications of the italicized phrase are that the sale was conditioned upon a delivery of the tools by the Government. Such an argument seeks to shift to defendant's shoulders the effect of plaintiff's procrastination in delivering its check. At the time the acceptance cablegram was sent, there was no question about plaintiff getting the tools from the Government, unless plaintiff itself failed to get them.

Under the circumstances, I am of the opinion that the acceptance cablegram was a conditional acceptance of the offer cablegram, and no contract resulted.

A verdict should have been directed for defendant.

WADE, Justice (dissenting).

I agree with the dissenting opinion of Mr. Chief Justice Pratt.

There is also another reason why I think we must conclude that there was no meeting of the minds and therefore no contract. The cablegram on which respondent relies as an offer to buy from it the property in question, in my opinion, is not an offer to purchase from respondent at all, but merely an authorization by appellant or by Brown-Bevis Company to respondent to make a bid on its behalf for the purchase of these hammers from the government, but not to exceed the price therein specified. The words of the cablegram on which I base my conclusion are as follows:

"* * * Reference hammers *bid maximum* 24 dollars each. * * *" (Italics mine.)

The words "bid maximum" as here used, in my opinion, require the construction that

"we authorize you to present our bid to the government up to the maximum expressly specified for the hammers in question."

The only possible purpose for the use of the word "maximum" in this sentence is to indicate that the addressee of this cablegram was authorized to use its discretion in the amount of the bid, but must not bid more than the maximum figure therein specified. If the appellant intended to make an offer to purchase these goods from respondent, the word "maximum" is not only out of place and meaningless but it expresses a meaning which is contrary to such intention. It does not indicate a firm bid but a limit and is inconsistent with an offer to purchase from plaintiff. And even if respondent's evidence were correct in regards to the oral conversation, still, in my opinion, the cablegram cannot be construed to mean that appellant intended to offer to purchase from respondent the goods in question because on the face of the cablegram it shows an

obviously different meaning. That the foregoing is the correct construction of this cablegram is also indicated by the fact that in the past the respondent had acted as the agent of the appellant in disposing of equipment manufactured by it.

I find nothing either in appellant's communications or actions which is inconsistent with its contention that the cablegram merely offered to make the respondent its agent. The fact that in its letter of confirmation appellant points out that it was not acting in its own behalf but was merely acting for Brown-Bevis Company is not an admission that it, or Brown-Bevis Company, was making a bid to purchase from respondent. In substance, its position was that it had sent the cablegram as the agent of Brown-Bevis Company. But such claim is not an admission that the cablegram was an offer to purchase from respondent. At the time this letter was sent, there was no dispute on this point. There was certainly no dispute as to the meaning of this cablegram. At that time no one had ever claimed that the cablegram was an offer to purchase from respondent and there was no occasion for appellant to point out that it was only authority for respondent to present an offer to the government. The cablegram was clear on this point and needed no explanation. However, on the face of the cablegram—it being sent by appellant—there was a definite indication that the appellant in sending the cablegram was acting in its own behalf and not for Brown-Bevis Co. and appellant took the very earliest possible occasion to prevent any misunderstanding on this point by stating that it was acting for Brown-Bevis Company.

I, therefore, think that the cablegram only constituted an authorization on the part of appellant for respondent to submit a bid in its behalf to the government.

For the foregoing reasons, I think the case should be reversed.