**W. Daniel ENGLISH, Plaintiff and Appellee,**

v.

**STANDARD OPTICAL CO., a Utah corporation, Defendant and Appellant.**

**No. 900422–CA.**

Court of Appeals of Utah.

June 25, 1991.

Rehearing Denied Aug. 27, 1991.

George A. Hunt (argued), Kurt M. Frankenburg, Snow, Christensen & Martineau, Salt Lake City, for defendant and appellant.

Gary E. Doctorman (argued), Elizabeth S. Whitney, Parsons, Behle & Latimer, Salt Lake City, for plaintiff and appellee.

Before BENCH, JACKSON and ORME, JJ.

## OPINION

JACKSON, Judge:

Standard Optical Co. (Standard) appeals a judgment based on a written lease agreement awarding W. Daniel English (English) rentals, repair expense, and attorney fees. We affirm.

## FACTS

In 1982, the parties entered into a lease agreement for a commercial building located in West Valley City. The third paragraph of the lease provided:

> To have and to hold said premises and office space under the terms of this agreement for *a term of ten (10) years* beginning on the 1st day of the month following ... and terminating at midnight on the last day of the same month *ten years hence.*

(Emphasis added.) The fourth paragraph of the lease provided a rental rate of $1000 per month for thirty-six months with each installment payment due on the "same calendar day during the term of the agreement." The fifth paragraph of the lease provided: "The monthly rent specified in the section above shall be negotiated every

36 months." Standard took possession of the premises September 1, 1982.

In 1985, the parties agreed on an adjusted rental rate of $1200 per month and set forth their agreement in a separate written and signed addendum to the lease. In July 1988, Standard ceased doing business at the leased premises and placed signs stating that the business had moved.

The parties engaged in various negotiations concerning the ongoing rental rate and future use of the premises, including the possibility of subleasing or a lease buy-out. No rent was paid on September 1 or October 1 of 1988. English inspected the premises, found damage, and changed the door lock on October 18. Standard delivered a $1600 check to English dated October 20, 1988, indicating on the check stub a rental rate of $800 beginning September 1. English returned the check because $800 per month rental was not agreeable. No rental was paid on November 1, 1988. Standard continued to remove its personal property from the premises.

About the first of November, Standard agreed in a phone call to English to pay $1000 per month rental and English hired repairmen to commence repairs. On November 21, English received the prior $1600 check from Standard with the indication on the check stub that $1000 was to be applied to the September rent and $600 as partial payment of the October rent. English negotiated the check. At the same time, Standard paid the power bill for the period ending October 18. On December 1, Standard issued a check to English for $1000 in rent which English received on December 5 and negotiated. At the same time, English wrote a letter to Standard acknowledging receipt of full payment of September and part of October "lease payments" and requesting full payment of $1000 per month for October through December. Standard paid the power bill for the period ending November 18. Standard made no further payments of rentals or utilities. English expended $9,852.66 for repairs and secured another tenant on July 1, 1989, for $990 per month rental.

## ISSUES

Standard challenges three legal conclusions of the trial court: (1) enforcement of the lease agreement was not barred by the statute of frauds, Utah Code Ann. § 25–5–3 (1989);[1] (2) enforcement of the lease agreement was not prohibited by English's entry on the premises; and (3) there was a legal basis for the award reimbursing expense of repair. Standard did not separately challenge the trial court's award of attorney fees to English as provided in their lease agreement, and English has requested attorney fees on appeal.

## STANDARD OF REVIEW

We accord conclusions of law no particular deference, but review them for correctness. *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985) (citations omitted).

## STATUTE OF FRAUDS AS A BAR TO ENFORCEMENT

The trial court ruled:

The court finds that pursuant to the lease in question the parties undertook to negotiate the monthly rental for the period 9/1/88 to 9/1/91. Pursuant to these negotiations the parties arrived at a monthly rental of $1,000. In addition to the oral testimony of this negotiated rental, Exhibits 13, 17 and 18 constitute documentary evidence of this negotiated monthly rental.

One thing I think is important that everyone understand, at least the view I took of the Statute of Frauds, it was my view that the Statute of Frauds did not apply to the renegotiation, since the 1982 lease was the writing in question, and that was the writing subject to the Stat-

---

1. Section 25–5–3 contains the following language:

    Every contract for the leasing for a longer period than one year, or for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party by whom the lease or sale is to be made, or by his lawful agent thereunto authorized in writing.

ute of Frauds, and there was full compliance with the Statute of Frauds. The renegotiated price was not subject to the Statute of Frauds. Even if subject to the Statute of Frauds, Exhibits 13, 17 and 18 constitute sufficient compliance.

■ Standard agrees with the finding that the parties agreed on a monthly rental of $1000. However, Standard claims that their agreement was merely oral and unenforceable due to the statute of frauds requiring this "term" to be in writing.[2] Further, Standard claims that Exhibit 13 (English's December letter) and exhibits 17 and 18 (Standard's rental checks) are not sufficient to satisfy the statute. Assuming arguendo that the statute does apply, we agree with the trial court that the above exhibits when taken together with the ten-year lease agreement, expressly or impliedly lend authenticity to the existence of the alleged oral agreement. "It is fundamental that the memorandum which is relied upon to satisfy the statute of frauds must contain all the essential terms and provisions of the contract [lease]." *Birdzell v. Utah Oil Refining Co.*, 121 Utah 412, 242 P.2d 578, 580 (1952) (citing *Collett v. Goodrich*, 119 Utah 662, 231 P.2d 730 (1951) and *Hawaiian Equipment Co. v. Eimco Corp.*, 115 Utah 590, 207 P.2d 794 (1949)).

*Birdzell* states that the essential parts of a lease to establish validity under the statute of frauds are: (1) identity of the property, (2) agreed term, i.e., time period, and (3) rental amount [rate] and time and manner of payment. *Id.* At the outset, the five-page lease agreement contained all of these terms and many more.[3] However, Standard claims that the written lease no longer sustained their prior agreement because the rental rate term became uncertain in 1988 due to failure of the parties to agree in writing to an adjusted rental rate pursuant to the following lease provision:

> The monthly rent specified in the section above [$1,000] shall be negotiated every 36 months.

■ We note that the purpose of the statute of frauds is that in important matters such as the demise of a ten-year leasehold in real property the parties should be protected against frauds and perjuries. *Guinand v. Walton*, 22 Utah 2d 196, 450 P.2d 467, 469 (1969) (citations omitted), *appeal after remand*, 25 Utah 2d 253, 480 P.2d 137 (1971).

> It is not to prevent the performance or the enforcement of oral contracts that have in fact been made; it is not to create a loophole of escape for dishonest repudiators. Therefore, we should always be satisfied with "some note or memorandum" that is adequate, when considered with the admitted facts, the surrounding circumstances and all ... evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement.

2 Corbin, *Corbin on Contracts* § 498 (1950) [hereinafter Corbin]. When an oral agreement has been made, "[o]ne or more writings, not all of which are signed by the party to be charged, may be considered together as a memorandum [of the agreement] for purposes of the statute of frauds if there is a nexus between them." *Machan Hampshire Properties, Inc. v. Western Real Estate & Development Co.*, 779

---

**2.** Standard also argues that the parties were required to agree to a further lease "term," i.e., the period of time during which the newly agreed $1000 rate would be the monthly rental. We think that a period of thirty-six months is implicit in the two written lease provisions stating the initial rental rate would be paid "each month for 36 months" and that the monthly rental would "be negotiated every 36 months." Accordingly, the parties had already agreed to adjust the rental rate on a thirty-six month schedule during the ten-year lease term.

**3.** Standard's statute of frauds argument assumes that the parties were negotiating either a renewal of the existing lease or a completely new lease agreement in 1988, rather than adjusting the rate element of the rental provision within the ten-year lease term. The parties had already agreed in writing that the rental would be paid monthly, that it would be due and payable on the first day of the month, that there would be a five-day grace period and that the rate would be adjusted every thirty-six months.

P.2d 230, 234 (Utah App.1989) (citation omitted).

Here, the written lease agreement was signed by both parties. There is a sufficient nexus between the lease document, English's letter to Standard and Standard's checks to English because they all relate to a lease of English's store property to Standard and the rate of monthly rental to be paid for the use and occupancy of the premises beginning in 1988. The written lease is clearly a memorandum of an agreement made by the parties and acknowledged and performed by both for six years. English's signed letter states that he is writing concerning the *lease payments* due for October, November and December and states that the rental amount is $1000. Typed on the stub of Standard's first check to English is "Sept. 800.00" and "October 800.00" and "1600—pay this amount." Standard changed the stubs in handwriting to "Sept. 1000.00" and "Oct—partial $600.00" and redelivered the check. Standard's second check is payable to English in the amount of $1000. Each of these documents is clearly connected to the others in the context of Standard leasing English's store. Standard affirmatively states and agrees that the parties did in fact orally agree to the $1000 amount. "It cannot give a court any great satisfaction to permit a defendant to escape from performing a contract he admits he has made." Corbin at § 320. *See also Bentley v. Potter*, 694 P.2d 617, 621 (Utah 1984) ("one opposing the claims cannot complain if he admits the existence of the guarantee"). These documents are sufficient written evidence of the parties' undisputed oral agreement on the $1000 rental rate to satisfy the statute of frauds. "All that is required is that these writings shall so clearly evidence that fact that a contract was made and what are its terms that there is no serious possibility that the assertion of the contract is false." Corbin at § 512. Here, there is no serious possibility that the assertion of the adjusted $1000 monthly lease rental rate is false. Thus, we conclude, as did the trial court, that enforcement of the lease agreement, as supplemented by the oral agreement to adjust the rental rate, was not barred by the statute of frauds.[4]

## ENTRY OF PREMISES BY ENGLISH NOT TERMINATION OF LEASE

The 1982 lease agreement demised the premises to Standard for ten years. Standard argues that because English changed the locks and initiated repairs in the fall of 1988, he terminated the lease and it could not be enforced.[5] The trial court concluded that English's actions did not constitute a termination of the lease but that Standard breached the lease by its failure to pay rent and maintain the premises.

Standard cites one Utah case to support its challenge to the trial court's legal conclusions, *Bass v. Planned Management Services*, 761 P.2d 566 (Utah 1988). In *Bass*, P.M.S., the landlord, appealed an award of trespass damages to Bass, the tenant. P.M.S. was found to have dispossessed Bass of the premises for ten days during the lease term. Our supreme court affirmed that award because P.M.S.'s change of the locks forced Bass's agent to gain access through a window and denied Bass access on at least one occasion.

4. *See Birdzell v. Utah Oil Refining Co.*, 121 Utah 412, 242 P.2d 578 (1952) (where a written and signed offer is relied upon as a memorandum, acceptance may be proved by oral testimony); *Hurlburt v. Gullo*, 750 P.2d 613 (Utah App.1988) (oral notice of election to exercise an option to renew a long-term lease does not violate statute of frauds). Appellant relies on *Pingree v. Continental Group of Utah, Inc.*, 558 P.2d 1317 (Utah 1976) and *Cottonwood Mall Co. v. Sine*, 767 P.2d 499 (Utah 1988). There both leases had expired upon their own terms, and the statute of frauds was not an issue.

5. The lease contained termination provisions in the event of Standard's failure to pay rentals: (1) English could "declare the agreement terminated" and "proceed to take possession of the demised premises" or (2) English could take action to evict Standard, make necessary repairs, relet, and hold Standard liable for repairs, re-renting expense and loss of rentals. The latter describes the action taken by English. However, on appeal the parties did not rely on the above lease provisions concerning termination. *Cf. Reid v. Mut. of Omaha Ins. Co.*, 776 P.2d 896 (Utah 1989).

Here, Standard did not claim tort damages for trespass but raised dispossession as a contract breach by English, claimed the breach terminated the lease, and that English was precluded from suing for rentals and repair expenses.

██ We note the following unchallenged findings of fact which support the trial court's legal conclusions: (1) On October 18, 1988, English changed the lock of the premises for the purpose of protecting the tools of the repairmen who would be working on the premises. (2) Each time Standard sought access to the property after the locks were changed, access was achieved. (3) On or about November 7, 1988, English's office gave a key to the premises to an employee of Standard. (4) At no time that Standard Optical attempted to enter the leased premises were they denied access. (5) English's actions never deprived Standard Optical of access to the premises. Additional findings are to the effect that Standard failed to maintain the premises and committed damage, and that English mitigated his losses by repairing and reletting the premises.

"At common law, the critical issue in applying the doctrine of surrender and acceptance is determining whether the landlord intended to accept the surrender. This intention may be express or implied." *Reid v. Mut. of Omaha Ins. Co.*, 776 P.2d 896, 900 (Utah 1986) (citations omitted). "[A] tenant raising the affirmative defense of surrender and acceptance has the burden of proving the landlord's intent to accept the surrender." *Id.* at 901. Standard's brief suggests the following evidence to support its burden that English accepted a surrender or otherwise terminated the lease: (1) While Standard had moved its operations elsewhere, it still had property on the premises, (2) it was in the process of negotiating rent, (3) it continued to pay·utilities, and (4) it continued to pay rent. Standard also claims it was unaware the locks had been changed. This assertion is in conflict with the unchallenged findings. The above evidence goes more to Standard's intent not to surrender the premises than to English's intent to accept

a surrender or to terminate the lease. Even if Standard had in fact surrendered, there is no evidence of an intention on the part of English to accept a surrender, or to terminate the lease—other than that he changed the locks. But the undisputed finding of the trial court was that his intent in changing the locks was to protect workmen's tools, not to terminate or accept a surrender. Moreover, English continued to pursue Standard for payment of rentals through December while taking action to preserve the property and mitigate damages. These facts do not show an acceptance of surrender nor a forgiveness of the agreed rental. *Meyer v. Evans*, 16 Utah 2d 56, 395 P.2d 726, 727 (1964). *See also Mariani Air Products Co. v. Gill's Tire Market*, 29 Utah 2d 291, 508 P.2d 808 (1973) (a surrender will not be implied against the intent of the parties, as manifested by their acts). Because *Reid* held the landlord has a duty to relet, it is not proper to treat reletting alone as sufficient evidence to show that English intended to accept a surrender of the premises and free Standard from all obligation for future rents. *See Reid*, 776 P.2d at 903–06 & n. 6. We conclude, as did the trial court, that Standard did not meet its burden of proving the intent of English to accept the premises as surrendered and terminate the lease. Thus, we affirm the trial court's award of rentals, past and prospective, pursuant to *Reid.*

## FINAL ISSUE NOT REACHED DUE TO NON-COMPLIANCE WITH APPELLATE RULE 24

██ Standard states the final issue to be "there is no basis for finding Standard liable for damage or lack of repairs." Standard's brief contains one and one-half pages of evidentiary, factual and legal assertions under this point. This "argument" contains two references to the lease agreement provisions regarding reasonable wear and depreciation and repairs. The point has no citations to the record and no legal authorities; accordingly the assertive analysis is not meaningful. This point fails to comply with our appellate rules which require the brief of the appellant to contain

an argument. "The argument shall contain the contentions and reasons of the appellant with respect to the issues presented with citations to the authorities, statutes and parts of the record relied on." Utah R.App.P. 24(a)(9). Due to non-compliance with our briefing rule, we decline to address this issue and assume the correctness of the judgment below. *Christensen v. Munns,* 812 P.2d 69, 72 (Utah App.1991); *Koulis v. Standard Oil Co. of Cal.,* 746 P.2d 1182, 1184–85 (Utah App.1987); *State v. Amicone,* 689 P.2d 1341, 1344 (Utah 1984). *See also Demetropoulos v. Vreeken,* 754 P.2d 960, 965 (Utah App.) (Jackson, concurring), *cert. denied by Rone v. Demetropoulos,* 765 P.2d 1278 (Utah 1988).

## CONCLUSION

We affirm the judgment of the trial court and remand for the limited purpose of determining reasonable attorney fees to be awarded appellee on appeal.

BENCH and ORME, JJ., concur.