John and Barbara CAMACHO, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. A94–052 CV (JKS).

United States District Court, D. Alaska.

Dec. 29, 1995.

George R. Lyle, Guess and Rudd, Anchorage, Alaska, for Plaintiffs John and Barbara Camacho.

Robert J. Branman, Trial Attorney, Tax Division, United States Department of Justice, Washington, DC, and Robert C. Bundy, United States Attorney, Anchorage, Alaska, for United States.

## AMENDED DECISION [1]

SINGLETON, Chief Judge.

### I. Jurisdiction

The Government appeals from a decision by the bankruptcy court which invalidated readjustment of the tax returns of John and Barbara Camacho ("Camachos") to reflect earlier adjustments to the returns of certain partnerships in which the Camachos were indirect partners. *See* 26 U.S.C. §§ 6221–

6233 (providing for a single unified audit and judicial proceeding in which all items of partnership income, loss, deduction, or credit affecting partnership tax liability would be uniformly adjusted at the partnership level). The Government also complains of the bankruptcy court's decision that John Camacho's "permanent fund dividend," which was levied pre-petition but delivered to the Government post-petition, became "property of the estate" subject to turnover. 11 U.S.C. § 542. The Camachos cross-appeal, presenting four issues. The Camachos first assert that the bankruptcy court erred in dismissing their fifth cause of action, which alleges that the Government is bound by its settlement agreement with the Camachos, or is estopped from denying such settlement, reached in connection with the 1984 assessments against the Camachos arising out of their investment in Utah Bioresearch. Second, the Camachos assert that the bankruptcy court erred in concluding that the Government's levy on John Camacho's 1992 permanent fund dividend was valid because the levy included liabilities other than the Camachos' 1984 tax year. Third, the Camachos assert that the bankruptcy court erred in refusing to award damages (including attorney's fees) pursuant to 11 U.S.C. § 362(h). Finally, the Camachos assert that the bankruptcy court erred in refusing to award attorney's fees pursuant to 26 U.S.C. § 7430.

The bankruptcy court had jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) (the district court shall have jurisdiction over all cases arising under Title 11); 28 U.S.C. § 157(a) (authorizing a general reference of bankruptcy matters to bankruptcy court); Misc. General Order No. 503 dated May 17, 1985 (referring all Title 11 cases and proceedings to the bankruptcy judges for the district of Alaska); and 11 U.S.C. § 505 (authorizing the bankruptcy court to determine the amount or legality of any tax).[2] This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a).

---

1. The substance of this Amended Decision is identical to the Decision issued on December 22, 1995. *See* Docket No. 50. All changes to the prior Decision are technical only and do not alter any of its legal conclusions. *See* FED.R.CIV.P. 60(a).

2. There is an issue of subject matter jurisdiction that has not been addressed by the parties or the bankruptcy court. Title 11, Section 505(a)(2), of the United States Code, provides that the bankruptcy court shall not determine the amount or legality of any tax that has previously been liti-

## II. Scope of Review

■ The bankruptcy court's findings of fact will be upheld unless "clearly erroneous." *In re Park–Helena Corp.*, 63 F.3d 877, 880 (9th Cir.1995); *In re Alcala*, 918 F.2d 99, 103 (9th Cir.1990). The bankruptcy court's conclusions of law and rulings on mixed questions of law and fact will be reviewed *"de novo." United States v. McConney*, 728 F.2d 1195, 1202–04 (9th Cir.1984) (*en banc* ) (discussing judicial review of questions of law and fact); *In re Downtown Properties, Ltd.*, 794 F.2d 647 (9th Cir.1985); *In re Markair, Inc.*, 172 B.R. 638 (9th Cir. BAP 1994).

## III. Facts and Procedural History

In 1983, the Camachos invested in a tax shelter partnership, Certainty Investment Club Partnership, which later changed its name to Senate Investment Club Partnership ("Club"). Club in turn invested in two additional partnerships, Union Energy Drilling Fund ("Drilling") and Sente Equipment, Ltd. ("Equipment"). In tax code parlance, Drilling and Equipment are referred to as top-tier or source partnerships because their income and losses were distributed to Club, which is referred to as a pass-through partnership because the Drilling and Equipment income and losses pass through Club to its partners, the Camachos, who are referred to as indirect partners to Equipment and Drilling. *See* 26 U.S.C. § 6231 (providing a definition for each of these terms except top-tier partnership). Equipment and Drilling each filed partnership tax returns for the 1983 and 1984 tax years. The K–1 schedules that

gated before, *inter alia*, the tax court. *See, e.g., Delpit v. C.I.R.*, 18 F.3d 768, 773 (9th Cir.1994); *Am. Principals Leasing Corp. v. United States*, 904 F.2d 477 (9th Cir.1990); *see also Peck v. C.I.R.*, 904 F.2d 525 (9th Cir.1990) (considering the collateral estoppel/*res judicata* effect of tax court decisions). This section therefore makes the doctrines of *res judicata* and collateral estoppel applicable in bankruptcy court to the extent that the debtor, or those with whom he is in privity, has previously litigated the issue before the tax court. Club attempted to litigate the issues regarding Drilling and Equipment's losses in the tax court. *See Sente Inv. Club Partnership of Utah v. C.I.R.*, 95 T.C. 243, 1990 WL 129305 (1990). Since the Camachos were partners in Club and the tax court litigation involved partnership property, *i.e.*, the disputed losses, it appears that the tax court decision binds the Camachos, but only as to the partnership property, *i.e.*, the losses claimed by Club which were attributable to loses of Drilling and Equipment. *See, e.g.*, Restatement (Second) of Judgments § 60(2) (1982) (a partner, *i.e.*, Club, who receives an adverse judgment in an action it brings on a partnership claim concerning partnership property bars another action on the same claim and is conclusive with respect to issues determined therein in a subsequent action involving obligations of the partnership); *see also* 4A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1105 and 6A WRIGHT & MILLER § 1564 (federal law looks to state law to determine whether a partnership has the capacity to sue and be sued in its own name).

In this case, the applicable state law would appear to be Utah since Club was formed there. Utah law permits general partnerships, limited partnerships, and joint ventures to sue and be sued in their common names. *See, e.g., Cottonwood Mall Co. v. Sine*, 767 P.2d 499, 500–01 (Utah 1988); *Gary Energy Corp. v. Metro Oil Products*, 114 F.R.D. 69 (D.Utah 1987). Thus, there exists a strong argument that the Camachos are bound by the decision against Club in *Sente Inv. Club* and cannot re-litigate in the bankruptcy court any issue decided, or which could have been decided, by the tax court against Club. 11 U.S.C. § 505(a)(2). This argument is supported by two observations. First, Camachos' interest in the property is merely derivative. The Camachos' interest arises from its partnership in Club, which was a partner in Equipment and Drilling. Thus, the Camachos' partnership property is actually its portion of Club's distributive share of Drilling and Equipment's losses and credits. Second, the Camachos' derivative interest has already been litigated. Drilling and Equipment's losses and credits was at issue in the tax court. The tax court ruled against Club. Thus, there is a strong argument that the Camachos are bound by the decision against Club in *Sente Inv. Club* and cannot re-litigate in the bankruptcy court any issue decided, or which could have been decided, in the tax court against Club. 11 U.S.C. § 505(a)(2).

Normally, a party waives reliance on *res judicata* and collateral estoppel by not raising them as issues in the trial court. The Government did not rely upon these doctrines in the bankruptcy court. Nevertheless, section 505(a)(2) seems to make this an issue of bankruptcy court jurisdiction—*see In re Teal*, 16 F.3d 619, 621–22 (5th Cir.1994)—and such issues must be addressed *sua sponte* since a court may not proceed in the absence of jurisdiction. *See, e.g., In re Bonner Mall Partnership*, 2 F.3d 899, 903 (9th Cir.1993). Since this matter must be remanded for other determinations, the bankruptcy court should consider its jurisdiction in light of section 505(a)(2) before proceeding further.

were filed by Equipment and Drilling showed Club's 99% ownership in each partnership. Drilling claimed an ordinary loss in excess of $3.5 million for 1983, whereas Equipment claimed an ordinary loss of nearly $2 million in 1983 and over $2.5 million in 1984. As a result of the Equipment and Drilling losses, Club in turn claimed approximately $4.5 million in ordinary losses in 1983 and approximately $2.4 million in ordinary losses in 1984. These losses were distributed to the partners of Club, including the Camachos, and were used by them to offset ordinary income on their tax returns in 1983 and 1984.

On October 22, 1990, the Secretary sent a delinquency notice and an intent to levy to the Camachos at their last known address in Hawaii.[3] The Secretary did not levy at that time. Thereafter, on September 1, 1992, the Government sent a notice of intent to levy to the Camachos with respect to their 1984 tax liability. On September 23, 1992, the Government served a notice of levy on the State of Alaska Department of Revenue, Permanent Fund Division.[4] This levy applied to a number of delinquent taxpayers, including the Camachos.

Equipment, Drilling, and Club were all subject to the unified partnership audit procedures established in 26 U.S.C. §§ 6221–6233 (TEFRA). The partnerships were audited and the Government was required to mail to certain of their partners ("notice partners") a notice of the beginning of the audit, referred to as Notices of Beginning of Administrative Proceedings ("NBAP"). Once the audit is complete, the Government must send the notice partners notice of its proposed adjustments to the return, referred to as the Notice of Final Partnership Administrative Adjustment ("FPAA"). Club attempted to litigate the Drilling and Equipment audits, but its attempt came too late. *See, e.g., Sente Inv. Club Partnership of Utah v. C.I.R.*, 95 T.C. 243, 1990 WL 129305 (1990). The tax court rejected Club's claim, finding that any dispute about the Drilling and Equipment audits would have had to have occurred at their respective partnership levels and not at Club's level. *Id.*[5] It appears that the Camachos were given the required notices of the Club audit. It is undisputed that the Camachos were not given personal notice of the Drilling and Equipment audits.

In the bankruptcy court, the Camachos argued that they were entitled to notice of the Drilling and Equipment audits under 26 U.S.C. § 6223.[6] The bankruptcy court

---

**3.** The Camachos deny receipt of the October mailing and dispute that there was a mailing. The bankruptcy court held an evidentiary hearing, considered the evidence produced by the parties, and concluded that the Government had proved by a preponderance of the evidence that the required notice had been mailed. The court relied primarily upon the documentary evidence and specifically found that the IDRS certified mailing list introduced by the Government was sufficiently similar to the Postal Form 3877 relied upon by the Ninth Circuit in *United States v. Zolla*, 724 F.2d 808 (9th Cir.1984) to establish proof of notice. The bankruptcy court's finding that notice was mailed in October of 1990 to the Camachos' last known address is not clearly erroneous.

**4.** The parties agree that the September 1, 1992 letter the Government served on the Camachos did not satisfy the notice requirements of 26 U.S.C. § 6331(d) because it did not provide the Camachos with at least 30 days notice prior to the levy on the Permanent Fund Division.

**5.** Procedurally, Club challenged the adjustments made to its tax returns. *Sente Inv. Club*, 95 T.C. 243. Since the adjustments were based, at least in part, on the audits and ensuing adjustments to the Equipment and Drilling tax returns, the Government moved to dismiss, for lack of jurisdiction, those portions of Club's petition which challenged the adjustments of the Equipment and Drilling audits. *Id.* The tax court granted the Government's motion, reasoning that it had jurisdiction over adjustments to Club's return, but not over adjustments to Club's returns which were based on prior adjustments to the returns of Equipment and Drilling. *Id.* The court set a trial date for Club's remaining challenges—challenges to the adjustments not linked to Equipment and Drilling—but Club failed to appear at trial. *Id.* The tax court thereafter dismissed the petition and the Government later made computational adjustments to the Camachos' returns.

**6.** Section 6223, titled "Notice to partners of proceedings," provides as follows:

(a) **Secretary must give partners notice of beginning and completion of administrative proceedings.**—The Secretary shall mail to each partner whose name and address is furnished to the Secretary notice of—

(1) the beginning of an administrative proceeding at the partnership level with respect to a partnership item, and

agreed in part.[7] It concluded that the Secretary was required to adopt regulations providing a means for indirect partners to assure that they would be given notice of agency action regarding top-tier or source partnerships in which they were indirect partners. The Secretary had adopted regulations, but those regulations had not won final approval in time to be utilized by the Camachos, had they wished to do so. Consequently, the bankruptcy court concluded that, until such time as the regulations went into affect, the Secretary was required to research each top-tier partnership to determine who its partners were, and if it discovered that a given top-tier partnership had one or more pass-through partners, then the Secretary was required to research the return of each pass-through partnership to determine its partners. Furthermore, if some of the indirect partners were themselves pass-through partnerships, the Secretary was required to research their returns *ad infinitum* until such time as all indirect partners were identified and notified.

## IV. Analysis

### A. The Government's Appeal

■ The bankruptcy court held that the Secretary's failure to more expeditiously enact regulations required the Secretary to research top-tier partnership returns to discover pass-through partnerships and then research each level of pass-through partnership returns in order to assure that any indirect partners its research disclosed would be given personal notice of top-tier partnership audits. In the bankruptcy court's view, the failure to enact regulations necessitates a modification of Congress' in-

tent, which was that the indirect partners are required to take responsibility for their derivative interests in the partnership property of top-tier partnerships and must give the Secretary special notice if they intend to be included as notice partners when top-tier partnerships are audited. This Court considered and rejected this argument in *Walthall v. United States,* 911 F.Supp. 1275 (D.Alaska 1995).

The heart of the argument is that indirect partners are somehow handicapped, in the absence of the regulations, in achieving a place on the Secretary's mailing list regarding top-tier partnerships in which they are indirect partners. The Court concluded that this was not so. Under the plain meaning of section 6223, indirect partners will be "notice partners" if, and only if, they, or someone on their behalf, separately notifies the Secretary of their interest in the top-tier partnership and of their desire to be notified of top-tier partnership audits. Thus, an indirect partner reading the statutes would know that unless special notice was given to the Secretary in some form, indirect partners must rely on the tax matters partner of the pass-through partnership for notice and an opportunity to participate in audits of top-tier partnerships. The Secretary's failure to promulgate more timely regulations prevents an argument that a particular manner of giving the Secretary notice was insufficient, but it does not appear that the Camachos were even aware of the existence of Drilling and Equipment, let alone that they unsuccessfully sought to communicate their interest in its audits to the Secretary and were foiled in

(2) the final partnership administrative adjustment resulting from any such proceeding.
A partner shall not be entitled to any notice under this subsection unless the Secretary has received (at least 30 days before it is mailed to the tax matters partner) sufficient information to enable the Secretary to determine that such partner is entitled to such notice and to provide such notice to such partner.

7. The bankruptcy court concluded that the Camachos were entitled to personal notice of the Drilling and Equipment audits and therefore never reached the question whether Drilling, Equipment, and Club had received the required no-

tices. At first glance, it appears that this issue remains for determination on remand. *But see Sente Inv. Club,* 95 T.C. 243 (holding that Club could not litigate the Drilling and Equipment audits which the Camachos wish to challenge, because such challenges had to be brought at the Drilling and Equipment partnership level) and *supra* note 2. However, since proper notice to Drilling, Equipment, and Club was necessary to the tax court's conclusion, which is a final judgment, and the appellate process has been exhausted, the tax court's decision appears to bind the Camachos under the doctrine of collateral estoppel, or if the claim is considered identical, *res judicata. See* discussion *supra* note 2.

doing so by the lack of regulations. It will be necessary to reverse the bankruptcy court's ruling on this issue.[8]

■ The Government next contends that the bankruptcy court erred in directing it to "turnover" John Camacho's permanent fund dividend for 1992, which it successfully levied pre-petition but did not receive until post-petition. This issue is controlled by 11 U.S.C. § 542(a), which, in substance, requires the person in possession of "property" which the trustee may use, sell, or lease under 11 U.S.C. § 363 to turn it over to the trustee. The property of the estate is defined in section 541 to include any property in which the debtor has a legal or equitable interest. Section 542 exempts from this turnover obligation, "[P]roperty [which] is of inconsequential value or benefit to the estate." Seizing on this clause, the Government argues that the permanent fund dividend in this case was of inconsequential value or benefit to the estate because Camacho's retained interest was bare legal title and as a result of the pre-petition levy all equitable interest in the dividend was transferred to the Government. The Government based its argument upon *Cross Electric Co. v. United States,* 664 F.2d 1218, 1220–21 (4th Cir.1981). It argued that the levy did not resolve any disputes between the Government and the debtor regarding a right to the permanent fund dividend. The levy did, however, result in a transfer of all the debtor's interest in the dividend to the Government, leaving the debtor only two rights: The right to redeem the dividend by paying the entire prior assessment secured by the levy; and the right to any surplus remaining after the property is sold at a foreclosure sale. When the property seized is cash, there is no need for a foreclosure sale to determine its cash value. Thus, it can be compared with the assessment secured by the levy to determine the likelihood of a surplus. In this case, the permanent fund dividend is significantly less than the tax owed. Thus, the Government reasons that the taxpayer would have to pay the assessed tax in order to redeem the dividend, *i.e.,* pay a larger amount of money in order to obtain a lesser amount of money. In sum, the Government concludes that given the limited "property rights" remaining to a debtor where the alleged property is cash and the assessment exceeds it in value, the property should be determined to be "property [which] is of inconsequential value or benefit to the estate."

■ The bankruptcy court rejected this argument. In its view, *Cross Electric* has been overruled by *United States v. Whiting Pools,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). The bankruptcy court relied upon *In re Challenge Air Int'l, Inc.,* 952 F.2d 384, 386–87 (11th Cir.1992) in forming this opinion. In the court's view, the Government's argument overlooks one significant right that the debtor retains in the permanent fund dividend after levy; the right to reclaim it by showing that the taxes assessed are not owed and that the debt allegedly secured by the levy does not exist. As the Supreme Court noted, the administrative levy is a provisional device which, in contrast to a lien foreclosure, does not determine that the Government's rights to the seized property are superior to other claimants, including the debtor. It does protect the Government, however, against diversion or loss while those claims are being resolved. *Whiting Pools,* 462 U.S. at 210–12, 103 S.Ct. at 2316–17; *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 721, 105 S.Ct. 2919, 2924–25, 86 L.Ed.2d 565 (1985). Where the dispute concerns a debtor's obligations as a taxpayer, and particularly the enforceability of a specific assessment secured by a levy, and when the property levied against is cash equivalent, the real issue presented is the forum in which the dispute over the property should be resolved. The Government would no doubt prefer to litigate in the tax court, or best yet, if the taxpayer can be persuaded to prepay the disputed tax and sue for refund, in the district court, but Congress preferred to have such disputes resolved in the bankruptcy court. *See* 11 U.S.C. § 505. "Section 542 simply requires the Service to seek protection of its interest according to the congressionally established bankruptcy proce-

---

8. The Camachos join in raising a number of arguments which were considered and rejected in *Walthall.* This Court will adhere to its decision in that case rejecting those arguments.

dures, rather than by withholding the seized property from the debtor's efforts to reorganize." *Whiting Pools,* 462 U.S. at 212, 103 S.Ct. at 2317.

The Government seeks to avoid this result by arguing that *Whiting Pools* is distinguishable. Essentially, the Government argues that the Supreme Court, in *Whiting Pools,* was primarily concerned with reorganizations and the fact that property in use may have a great value in keeping a going business alive where the same property disposed of at a fire sale would bring in little value to the estate. Such concerns do not exist where the property is cash or its equivalent, notes the Government. This argument is undercut by *In re Gerwer,* a Ninth Circuit opinion, which applied *Whiting Pools* to liquidations as well as reorganizations and specifically addressed the importance of a *bona fide* dispute between debtor and creditor in determining whether a specific item of property in the possession of the creditor was of value to the estate. 898 F.2d 730, 733, 734 (9th Cir.1990). In *Gerwer,* the court discusses the creditor's right to protection under section 363(e) and the trustee's right under section 363(f)(4), to dispose of the collateral free and clear of the security interest where the debt secured is subject to a *bona fide* dispute. The Court relates this discussion to the exception to turnover for property "of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). *Gerwer* supports the bankruptcy court's conclusion that wherever there is a *bona fide* dispute regarding the taxes owed, and if the dispute is resolved in the taxpayer's favor, *i.e.,* the taxpayer is entitled to recover all, or even part, of the amount levied, the turnover should be honored and the dispute between the debtor and the Internal Revenue Service resolved in the bankruptcy court.

Here, the levy was based upon the adjustments to the returns of Drilling and Equip-

ment. The Camachos' contend that those adjustments cannot be used to increase their tax liability because the Secretary failed to provide them with timely notice of the audits of the top-tier partnerships. This position created a dispute, which the bankruptcy court resolved in favor of the Camachos. It was thus *bona fide.* The bankruptcy court did not err in directing the Secretary to turn over the permanent fund dividend so that any dispute regarding the Camachos' taxes could be resolved in that court.[9]

### B. The Camachos' Cross–Appeal

In their cross-appeal, the Camachos argue that the bankruptcy court erred in four particulars. First, they contend that they should have received an award of attorney's fees for successfully defeating the Government's claims regarding Club, Drilling, and Equipment. The bankruptcy court held in favor of the Camachos and invalidated the tax, but concluded that the Government's position was substantially justified. *See, e.g.,* 26 U.S.C. § 7430 (establishing the circumstances in which a prevailing taxpayer may recover his attorney's fees from the Government). The Camachos argue that the Government's position was not substantially justified. Since the Camachos are no longer the prevailing party on the validity of the assessment, this claim is now moot.

The Camachos next challenge the bankruptcy court's finding that the levy against the permanent fund dividend was valid. Essentially, the Camachos argue that the levy sought to attach for taxes owed in years other than 1984, the year mentioned in the notice of intent to levy. The Camachos concede that the bankruptcy court found against them on this issue and that the court's findings of fact must be upheld unless clearly erroneous, but contend that one finding of fact, really a paraphrase of the testimony of

---

**9.** The decision of the bankruptcy court is also supported by *In re Contractors Equipment Supply Co.,* 861 F.2d 241, 244–45 (9th Cir.1988), which applied *Whiting Pools* to an intangible—an account receivable—and held that so long as the creditor's interest is a security interest, the debtor has significant interest to make the account property of the estate. The Government's reliance on *Begier v. I.R.S.,* 496 U.S. 53, 110 S.Ct.

2258, 110 L.Ed.2d 46 (1990) is misplaced. There, the Supreme Court held that property which the debtor held in trust for the Government was not property of his estate since he held mere legal title. In contrast, as the bankruptcy court determined, the debtor retains an interest in levied property so long as the legality of the tax assessment is at issue.

Ms. Guisinger, an IRS employee, was erroneous. The Camachos misunderstand the bankruptcy court's conclusions. The bankruptcy court did not rely on a misunderstanding of Ms. Guisinger's testimony, but rather, on the totality of the evidence. The court's finding that the levy was valid is not clearly erroneous.

■ The Camachos next argue that the bankruptcy court erred in not awarding them actual and punitive damages and attorney's fees for successfully defeating the Government's claim to John Camacho's permanent fund dividend which was ordered by the bankruptcy court to be turned over. In the Camachos' view, the Government's failure to "turn over" the permanent fund dividend when requested by their counsel constitutes a "willful violation" of the automatic stay in 11 U.S.C. § 362(h). The levy in question occurred pre-petition on September 23, 1992. The Camachos filed their bankruptcy petition on September 30, 1992.[10] The Government's receipt of the permanent fund dividend occurred post-petition in November 1992. Thus, the alleged willful violation is the failure to "turn over" the permanent fund dividend on request of the attorney for the Camachos. The bankruptcy court concluded that the Government did not commit a "willful" violation of the stay. Clearly, there was a *bona fide* dispute between the parties regarding whether the permanent fund dividend was "property of the estate" subject to

turnover and therefore covered by the stay. The Ninth Circuit has indicated, however, that such disputes do not prevent a violation from satisfying the "willfulness" requirement. *See, e.g., In re Pinkstaff,* 974 F.2d 113, 115 (9th Cir.1992); *In re Bloom,* 875 F.2d 224, 227 (9th Cir.1989). The Ninth Circuit appears to hold that where a creditor disputes the applicability of the stay to property in its possession, it must honor the stay and apply to the bankruptcy court for relief. *Id.* If it fails to honor the stay, it must pay damages and attorney's fees, even if it ultimately prevails. *But see In re Strumpf,* 37 F.3d 155, 159 (4th Cir.), *rev'd sub nom., Citizens Bank of Maryland v. Strumpf,* —— U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). On remand, the bankruptcy court should reconsider this issue in light of *Pinkstaff,* and if damages and attorney's fees are denied, make findings of fact and conclusions of law to enable meaningful review.[11]

■ Finally, the Camachos argue that the bankruptcy court erred in failing to find that they detrimentally relied on certain settlement negotiations, *i.e.,* promises by the Government to abate certain assessments by failing to file their bankruptcy petition at an earlier time, which permitted the Government to file additional tax liens against them. The bankruptcy court considered that the Camachos may have proved misleading conduct by Government agents, but held that finding estoppel under these circumstances

**10.** The Court is aware that the Government sent a notice of intent to levy on September 1, 1992, and actually levied on September 23, 1992, less than thirty days thereafter. *See* 26 U.S.C. § 6331(d) (forbidding levies less than thirty days after a notice of intent to levy is mailed to the taxpayer's last known address). It appears that the Camachos timed their bankruptcy petition to avoid any levy and were frustrated only because the bankruptcy court found an earlier notice of intent to levy in October 1990 sufficient to allow the September 23, 1992 levy.

**11.** This Court is not deciding that any damages or attorney's fees are necessarily proper. Damages should be proved, not presumed. Section 363(e) requires that any property turned over in which the creditor has a security interest shall assure adequate protection to the creditor. In this case, when the issue was resolved, the permanent fund dividend was deposited in a controlled account so that it was not available to the

debtor while these issues were being litigated. Thus, it is not clear that the debtor suffered any actual damages by virtue of the delay by the Government in turning over the permanent fund dividend, other than those traceable to the natural delay attending litigation. Nor is it clear that this is an appropriate case for punitive damages, considering the uncertainty in the law regarding the issues in question. *See Bloom,* 875 F.2d at 227–28 (requiring reckless or callous disregard of the debtors rights to justify punitive damages). These are matters that should be addressed by the bankruptcy court in the first instance.

The bankruptcy court should also consider the importance, if any, of the recent United States Supreme Court decision in *Citizens Bank of Maryland v. Strumpf,* —— U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) on the issue of recoverable damages where a creditor delays turning over property that is security for its debt until the bankruptcy court has the opportunity to assure the safeguards managed by section 363(e).

would injure the public interest, and by implication, give the Camachos a windfall. The court therefore declined to impose an estoppel and to abate the assessments. This decision appears correct. *See United States v. Hemmen*, 51 F.3d 883, 892 (9th Cir.1989); *Watkins v. United States Army*, 875 F.2d 699, 707 (9th Cir.1989).[12]

**IT IS THEREFORE ORDERED:**

The orders of the bankruptcy court are **AFFIRMED IN PART AND REVERSED IN PART. THIS MATTER IS REMANDED TO THE BANKRUPTCY COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS DECISION.**

---

12. The bankruptcy court seems to have assumed that the Camachos presented a *prima facie* case that the Government knew the true facts regarding the assessments. In light of this Court's decision, what the Camachos consider the true facts—that the assessments were invalid—is incorrect. The bankruptcy court was also apparently willing to assume that the Camachos did not know the Government's true intent, and in reliance on their misunderstanding, deferred petitioning for bankruptcy. *Hemmen*, 51 F.3d at 892. Nevertheless, the Government's conduct, even if it constituted misrepresentations, seems more akin to inaction than affirmative misconduct, and the people's interest in having taxes collected would suffer if an estoppel were applied. There is no evidence that Government agents intended or at least should have expected that the Camachos would defer filing bankruptcy in reliance on the ongoing settlement negotiations. In sum, the Camachos have not presented a compelling case for the extraordinary remedy of an estoppel against the Government.