COTTONWOOD MALL COMPANY,
Plaintiff, Appellee, and
Cross–Appellant,

v.

Wesley F. SINE, dba Cottonwood
Bowling Lanes, et al., Defendant,
Appellant, and Cross–Appellee.

COTTONWOOD MALL COMPANY, a
joint venture, Plaintiff and Appellee,

v.

Wesley F. SINE, dba Cottonwood Bowl-
ing Lanes, Defendant and Appellant.

Cottonwood Bowling Lanes,
Inc., Intervenor.

Nos. 19839, 19861.

Supreme Court of Utah.

Nov. 17, 1988.

Rehearing Denied Jan. 25, 1989.

Raymond Scott Berry, Salt Lake City, for Cottonwood Mall Co.

Jack L. Schoenhals, Salt Lake City, for Wesley F. Sine.

Ronald C. Barker, Salt Lake City, for Cottonwood Bowling Lanes.

HOWE, Associate Chief Justice:

Plaintiff Cottonwood Mall Co., a joint venture, brought this action to recover possession of space in the Cottonwood Mall occupied by defendant Wesley F. Sine and intervenor Cottonwood Bowling Lanes, Inc., a corporation of which Sine is the president. Defendant and intervenor (hereinafter defendant or Sine) counterclaimed to enforce an alleged oral agreement to renew the expired lease under which the space was held. From a judgment in favor of plaintiff, defendant appeals. Plaintiff cross-appeals from the denial of an award

of attorney fees incurred in recovering possession of the space.

On May 4, 1961, Sidney M. Horman, as lessor, and S.W. Pugsley, as lessee, entered into a twenty-year lease of space in the Cottonwood Mall, a shopping center in Salt Lake County, Utah, to be used for bowling lanes. In 1979, Sine was contemplating the purchase of the outstanding stock of Cottonwood Bowling Lanes, Inc., a corporation, which operated the bowling lanes. The corporation was controlled by Pugsley's son. Sine caused his real estate agents to approach Horman and inquire as to his willingness to renew the lease which was due to expire on September 14, 1981. On at least two occasions, Horman advised the agents that he would be willing to renew the lease on reasonable terms, but that he would not sign a new agreement until closer to the time the lease expired. Allegedly based on these representations, Sine purchased the outstanding stock of the Cottonwood Bowling Lanes, Inc., for $338,000, took an assignment of the lease, and began to operate the bowling lanes.

Prior to expending money for improvements on his newly acquired space, Sine again requested his agents to inquire of Horman regarding renewal of the lease. Horman allegedly assured the agents that he would renew the lease on reasonable terms at or about the time the present lease would expire. Sine contends that he spent $10,000 to $20,000 to improve and remodel the leased space, based on the additional representation by Horman and his reputation for being a man of his word. Horman's interest in the lease was thereafter assigned to plaintiff.

Prior to the expiration of the lease, plaintiff notified defendant that the lease would expire by its terms on September 14, 1981, and that defendant would become a tenant on a month-to-month basis as provided for in the lease. In October of 1981, plaintiff increased the monthly rental substantially and shortly thereafter notified defendant that the month-to-month tenancy was terminated and the premises should be vacated by November 30, 1981. Defendant did not vacate by that date, as the parties were

involved in negotiating a new lease. When those efforts failed, plaintiff brought this action to recover possession and its attorney fees thereby incurred. Defendant counterclaimed, seeking to enforce Horman's oral promise to renew upon reasonable terms. Before trial, defendant vacated and moved to other premises. The trial court denied defendant any relief on its counterclaim and awarded judgment to plaintiff for the reasonable rental value of the leased space during the time that defendant occupied it after the expiration of the written lease. Plaintiff, however, was refused any attorney fees. Defendant appeals, and plaintiff cross-appeals from the judgment.

## I

In its answer to plaintiff's complaint, defendant asserted the defense of lack of standing of plaintiff, a joint venture, to sue in the name of the joint venture as indispensable parties plaintiff. It argued that the individual members are the "real party in interest" under Utah Rule of Civil Procedure 17(a). The trial court denied a pretrial motion to dismiss the complaint based on this defense. Utah Code Ann. § 48–1–3.1 (1981, Supp.1987) defines a "joint venture" as "an association of two or more persons to carry on as co-owners of a single business enterprise" and provides that the property and transfer rights of joint ventures shall be governed by the same statutes as general partnerships. Sections 48–1–1 through –40 contain Utah's adaptation of the Uniform Partnership Act. Its provisions are silent on whether a partnership may sue in its own name. Rule 17(d) of the Utah Rules of Civil Procedure states that a partnership may be sued in its common name, but whether the partnership may sue is not specified. We noted in *Kemp v. Murray*, 680 P.2d 758, 759 (Utah 1984), that whether a partnership is empowered to sue in the partnership's name has not been decided in this state. Earlier in *Wall Investment Co. v. Garden Gate Distributing, Inc.*, 593 P.2d 542 (Utah 1979), we held that a limited partnership is a statutory creation and, having characteristics somewhat similar to corporations, could sue in

the courts of this state in its own name without identifying its partners or making them plaintiffs. We noted in that case that the common law rule that partners were required to join as plaintiffs in actions to enforce partnership rights has been criticized as a "useless relic of strict procedural rules with nothing, apparently, to justify its continued existence" and that the modern tendency is to depart from it.

Recently, in *Gary Energy Corp. v. Metro Oil Products,* 114 F.R.D. 69 (D.Utah 1987), Judge Winder analyzed the issue under Utah law and concluded that a joint venture can bring suit in its common name without the necessity of naming the joint venturers as plaintiffs. Noting our criticism in *Wall Investment Co.* of the common law rule and the tendency of courts to depart from it, Judge Winder opined that this Court would, when faced squarely with the issue, hold that joint venturers may sue in the name of the joint venture. In that decision, he also relied upon a recent opinion, *Decker Coal Co. v. Commonwealth Edison Co.,* 714 P.2d 155, 56 A.L.R.4th 1227 (Mont.1986), which came to that same conclusion after an analysis of Montana statutes and rules of procedure. The court there noted that there was no statute or rule of procedure in Montana granting partnerships or joint ventures the right to sue in their own names. Montana Rule of Civil Procedure 17(b) states that the capacity of persons to sue and be sued should be determined by appropriate statutory provisions. The court therefore looked to provisions of the Uniform Partnership Act, which has been adopted in Montana. Section 8 of the Act (our section 48–1–5) provides that partnerships may own property. Section 9(3)(e) (our section 48–1–6(3)(e)) speaks of partnership "claim[s]." Another Montana statute allows partnerships to be sued in their own names. Finally, the court noted that partnerships are authorized to file small claims actions. In commenting on the effect of the foregoing statutes, the court stated:

> [T]his Court has little choice but to follow the clear intent of the Montana Legislature to treat partnerships as distinct entities with power to sue. It would be illogical and unfair to conclude that a partnership may own a claim but cannot enforce it; may own property but cannot protect it; may be sued but cannot sue; may sue in small claims court but not in Federal Court. The Montana Legislature should not be deemed to have acted so capriciously.

*Decker Coal Co.,* 714 P.2d at 157. To the list of examples given by the Montana court where the Uniform Partnership Act treats a partnership as an entity, we add section 13 of the Act (which is our section 48–1–10), making the partnership entity liable for the negligence of one of the partners while acting within the ordinary course of the business of the partnership. *See Wayne–Oakland Bank v. Adams' Rib,* 48 Mich.App. 144, 210 N.W.2d 121 (1973) (where a partnership was held liable for a partner's negligence even though the partner had immunity under the law by reason of his parental relation to the injured party).

■ We agree with the analysis and reasoning of Judge Winder in *Gary Energy Corp.* and with the Montana Supreme Court in *Decker Coal Co.* and hold that the trial court properly denied defendant's motion to dismiss.

## II

Defendant contends that the expressed affirmations and promises of Horman and defendant's reliance thereon either renewed the written lease or, in the alternative, entitled defendant to a renewal of the lease upon "reasonable terms." In that event, "reasonable terms" would be based on the written lease, the only issues to be determined being the amount of rent and the term of the renewed lease. This contention is fully answered by *Pingree v. Continental Group of Utah, Inc.,* 558 P.2d 1317 (Utah 1976). There, the lease granted the lessee the option to renew the lease for two separate additional five-year terms upon the same terms and conditions of the original lease, except

that the rental amount will be renegotiated; however, maximum total monthly rental shall not exceed $900 per month.

Factors of tax increase, costs of business increases or decreases, business volume and success, insurance costs and other reasonable allowances, will be the basis for terms of negotiation.

*Pingree*, 558 P.2d at 1320.

The lessee gave timely notice of his exercise of the option to renew. The lessors responded that the new rental would be $900 per month, basing their demand on the increase in taxes and insurance and what they considered to be a fair return on their investment in the leased premises. The lessee replied and proposed $500–per-month rent based on his increased costs of doing business and a decrease in his volume. When the parties were unable to agree on the rent for the renewal period, the lessor brought an action to recover possession. The lessee counterclaimed for enforcement of a five-year renewal at $500 per month. The trial court found that the parties had impliedly agreed on a reasonable rental figure which the court determined and fixed at $900 per month. On appeal, this Court reversed the trial court, stating that it had nullified the express factors specified by the parties in the lease and had substituted a new agreement to which the parties had not committed themselves. We held that the option to renew was too vague and indefinite to be enforceable and that the lease terminated at the end of the original term. We cited with approval and relied on *Valcarce v. Bitters*, 12 Utah 2d 61, 362 P.2d 427, 428 (1961), where we stated, "[A] condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness to be enforced." In so ruling, this Court followed what was termed the majority rule in *Slayter v. Pasley*, 199 Or. 616, 264 P.2d 444 (1953), which was stated to be that a provision for the extension or renewal of a lease must specify the time the lease is to extend and the rate of rent to be paid with such a degree of certainty and definiteness that nothing is left to

future determination.. If it falls short of this requirement, it is not enforceable. *Pingree*, 558 P.2d at 1321. In reversing the trial court, this Court expressly rejected its attempt to fix a reasonable rent for the parties when their negotiations bogged down.

Defendant would have us now do what we refused to do in *Pingree*. While it is true that defendant adduced evidence as to what would be a reasonable renewal term and what would be a reasonable rent, the trial court properly spurned defendant's invitation to find or make an agreement where the parties had themselves failed. Defendant argues that in *Pingree*, the court declined to fix the renewal rent because of the difficulty in balancing the several factors which the lease required the parties to consider in fixing the rent. Here, defendant's argument continues, no factors are listed in the lease and the task is less complicated. We do not agree. In determining what is "reasonable rent," many factors must be weighed and put into the equation. Business judgments must be made. Horman testified that he would not negotiate a new lease at the time Sine's real estate agents approached him because of inflation and instability in the commercial leasing market. He was unwilling to enter into another lease, either long term or short term, unless he could consider the costs of operating and owning the building as they compared to the amount of rent received. He only indicated that he would be willing to enter into a new lease at a reasonable figure and at the appropriate time. After he sold his interest in the leased property to plaintiff, plaintiff and defendant were unable to agree on the amount of rent. Courts simply are not equipped to make monetary decisions impacted by the fluctuating commercial world and are even less prepared to impose paternalistic agreements on litigants. We therefore conclude that the written lease terminated by its own terms at its expiration date, was not renewed by the parties, and cannot be renewed for them by the courts.

## III

Turning now to plaintiff's cross-appeal, namely, that the trial court erred in denying it attorney fees, plaintiff's claim for fee was premised on the following provision in the 1961 written lease:

If, during the terms of this lease, lessor is required to commence any action to collect any of the rental due under this lease, or to enforce any of the provisions herein, or to secure possession of the leased premises in the event this lease is terminated as herein provided, or at the expiration of the term, lessee agrees, in such event or events, to pay all costs of such action or actions, together with reasonable attorney's fee.

The trial court denied fees "for the reason that the lease agreement upon which plaintiff makes claim for attorney's fees expired by its terms, and the plaintiff terminated the lease agreement and treated the lease agreement as though it had expired and been terminated...."

We do not agree with that conclusion. It is true that the 1961 written lease was for a twenty-year term that expired on September 14, 1981; however, paragraph 36 of that lease provided: "Any holdover beyond the termination of this lease, and any acceptance of rental beyond the term of this lease shall be deemed to have established a month-to-month tenancy as between lessor and lessee." Nothing is there stated, however, regarding whether the provisions and conditions of the written lease are binding on the parties during the month-to-month tenancy. It is a firmly established rule that proof of a holding over after the expiration of a fixed term in a lease gives rise to the presumption, which in the absence of contrary evidence will be controlling, that the holdover tenant continues to be bound by the covenants which were binding upon him during the fixed term. Annotation, *Binding Effect on Tenant Holding Over of Covenants in Expired Lease*, 49 A.L.R.2d 480 (1956). It is further pointed out there that this rule obtains even though certain of the provisions in the expired lease are changed, such as, for example, the provision as to the amount of rent to be paid.

Applying those rules to the instant case, when the twenty-year term of the 1961 written lease expired on September 14, 1981, defendant held over on a month-to-month basis and continued to be bound by the provisions and conditions of the written lease during that holdover period. The fact that on October 12, 1981, plaintiff notified defendant that the monthly rental was being increased from $2,150 per month to $4,500 per month did not affect the binding force of the other provisions of the written lease. On October 23, 1981, plaintiff advised defendant that it had elected to "nullify" the month-to-month tenancy and requested that defendant vacate the premises by November 30, 1981. Since there was no evidence by either party that the provisions and conditions of the written lease were modified during the month-to-month tenancy, except for the increase in the amount of rent, the provision in the 1961 lease regarding attorney fees remained binding on the parties until the month-to-month tenancy expired on November 30, 1981. At that time, defendant had the duty to vacate, and when it failed to do so, the provision for the payment of attorney fees became operative. As will be noted, that provision specifically covers actions by the lessor to secure possession of the premises at the expiration of the lessee's term, which under the rule stated above includes the holdover period. Consequently, the trial court erred in denying any award of attorney fees to plaintiff.

The judgment is affirmed, and the case is remanded to the trial court to determine and fix the amount of attorney fees and trial and appeal costs to which plaintiff is entitled under paragraph 33 of the written lease.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.