**BROWN'S SHOE FIT CO., an Iowa partnership; Tom Brown; and Brown's General Offices, an Iowa corporation, Plaintiffs and Appellants,**

v.

**Jon OLCH, Janet Olch, Henry Sigg, and 330 Main Street Partners, Defendants and Appellees.**

No. 970199–CA.

Court of Appeals of Utah.

April 2, 1998.

R. Paul Van Dam and Bruce E. Wycoff, Salt Lake City, for Plaintiffs and Appellants.

Richard D. Burbidge, Stephen B. Mitchell, and Robert M. Felton, Salt Lake City, for Defendants and Appellees.

Before DAVIS, P.J., and BILLINGS and JACKSON, JJ.

## OPINION

DAVIS, Presiding Judge:

Brown's Shoe Fit Company, Tom Brown, and Brown's General Office (collectively Brown's Shoe) appeal the trial court's summary dismissal of their claims of specific performance, fraud, and breach of contract in favor of appellees Jon Olch, Janet Olch, Henry Sigg, and 330 Main Street Partners (collectively Partners). Partners appeal the trial court's summary dismissal of their counterclaim for abuse of process.

---

1.  The street address of the Property was originally thought to be 330 Main Street; thus, the name

## FACTS

Brown's Shoe brought this action to specifically enforce, as a binding commercial lease agreement with Partners, a one-page document entitled "Basic Lease Provisions" or, in the alternative, to recover damages resulting from Partners' breach of that agreement. Partners counterclaimed alleging abuse of process.

Brown's Shoe Fit Company is a partnership organized to operate a shoe store in Park City, Utah. Tom Brown and Brown's General Offices are the two partners in the proposed Park City store and were also partners in other Brown's Shoe partnerships operating family shoe stores in Colorado, South Dakota, Arizona, and California.

Partners is a partnership formed for the purpose of owning land and developing an office building at 340 Main Street, Park City, Utah (the Property).[1] Jon Olch, Janet Olch, and Henry Sigg are partners in 330 Main Street Partners.

In early 1989, Tom Brown began researching the possibility of opening a shoe store in Park City. After reviewing information on the Park City market, Brown decided to move ahead and open a Park City store. Brown contacted a Park City realtor regarding available retail space suitable for a proposed shoe store. After investigating several locations over the next two years, Brown concluded that only locations in the Historic Main Street area would be of interest. On one of his trips to Park City, while responding to a "For Lease" sign on one of the "best" retail locations in Park City, Brown contacted Henry Sigg. Sigg offered to help Brown find a suitable Main Street location.

On October 8, 1993, Sigg called Brown and told him of the Property, which would be available during the fourth quarter of 1994. Sigg indicated the general leasing terms and asked Brown to send a "letter of intent" to Jon Olch, the prospective landlord. Brown prepared and sent to Sigg a letter paralleling a letter already prepared by a prospective tenant at the Property, which Sigg had tele-

330 Main Street Partners.

copied to Brown. Brown and Sigg had further discussions about Brown's Shoe's occupancy of a part of the Property, and on February 12, 1994, Brown finally met with John Olch to discuss occupancy terms.

On February 15, upon his return to California, Brown sent a letter addressed jointly to Olch and Sigg summarizing the lease terms discussed at the February 12 meeting. Then, on February 16, during a phone conversation between Sigg and Brown, Sigg indicated that he and Olch had discussed the February 15 letter and that Olch required some changes to Brown's February 15 proposal. On February 18, Brown sent Sigg a revised outline of lease terms incorporating Sigg's requested changes.

On March 18, 1994, Brown, acting for Brown's Shoe, and Sigg, acting for Partners, executed a document entitled "Basic Lease Provisions" (the BLP) [2] setting forth certain terms the parties had agreed to up to this point. The BLP provided for an initial three-year term and for two three-year option periods. The BLP explicitly stated that the terms were "agreed upon" by the parties

and were "to be incorporated into a final lease." The BLP further provided that the rent for the initial period, and for each option period, would be based on (1) agreed-upon per-square-foot rental rates and (2) a percentage override on Brown's Shoe's Park City sales above a certain gross-volume threshold. The gross-volume threshold was specified for the first three-year lease period. However, although the BLP established minimum per-square-foot rents for the option periods, it did not contain agreed-upon percentage rent for those periods. Instead, the BLP specifically provided that prior to the beginning of each option period, the parties "would agree on the gross volume figure from which to base additional rent during each year" of that option period. Neither the term "gross volume" nor the actual "gross volume" were defined by the BLP.

Brown testified at his deposition that "[t]he effect of this document is that I moved ahead feeling that I had an agreement for a lease for a location." He further testified that his intent when signing the BLP was "to firm up and have a written document reflecting the negotiations up to this point."

2. The text of the BLP is as follows:

BASIC LEASE PROVISIONS

Following are terms and conditions agreed upon by and between 330 Main Street Partners a Utah Limited Liability Corp. and Brown's Shoe Fit Co. to be incorporated into a final lease document executed by both parties.

*TERM OF LEASE* The initial lease term will be for three years. Lessee will have the option to renew the lease for two additional three year option periods. The terms and conditions of the option periods are specified herein and will be incorporated into the lease agreement.

*TENANT IMPROVEMENTS* Brown's Shoe Fit Co. will be responsible for making the necessary tenant improvements required to operate a shoe business. Paint ready walls, suspended ceilings (or similar), heating, electrical and "slab" floor will be provided by Lessor.

*RENTAL AMOUNT*

Year One—base rent of $19 per square foot. In addition to the base rent, tenant will pay 6% of any gross volume over $600,000 as additional rent.

Second Year—base rent of $21 per square foot. In addition to the base rent, tenant will pay 6% of any gross volume over $600,000 as additional rent.

Third Year—base rent of $23 per square foot. In addition to the base rent, tenant will pay 6% of any gross volume over $600,000 as additional rent.

All rent paid will be on a N N N basis and include tenants['] pro rata share of property taxes, insurance and utilities. The first three year option will not include a CPI increase. *FIRST OPTION PERIOD* Base rent will be $24 per square foot. Prior to commencement of the first option period, Lessor and Lessee must agree on the gross volume figure from which to base additional rent paid during each year of the first option period. Each successive year of the first option period will include a CPI increase, in addition to the minimum monthly rental.

*SECOND OPTION PERIOD* Base rent for the second option period will be that amount paid the last year of the first option period plus the CPI increase. Prior to commencement of the second option period, Lessor and Lessee must agree on the gross volume figure from which to base additional rent paid during each year of the second option period. Each successive year of the second option period will include a CPI increase, in addition to the minimum monthly rental.

*IMPROVEMENT, LOCATION, AND SIZE* The size of the leasehold space will range from 1750 sq. ft. to 1850 sq. ft. as per approved plans. The location of the premises is a building to be located at approximately 330 Main Street, Park City, Utah.

Brown considered the BLP to be an agreement that would be incorporated into a future lease.

On March 28, 1994, ten days after the BLP was signed, Brown sent a memorandum to prospective partners in the Park City store in which he stated: "There is [sic] still a lot of things that have to be worked out with the landlord, but it looks like it is going to be a go." In the memorandum, Brown acknowledged that a final lease agreement still needed to be worked out with Partners.

When the parties signed the BLP on March 18, 1994, no building yet existed on the Property. In fact, construction did not commence until November of that year and was not completed until December 1995. To obtain a construction loan for the Property, Partners presented to a lending institution the BLP as a commitment letter from a prospective tenant.[3]

Immediately following the execution of the BLP, Brown's Shoe proceeded to order inventory for the Park City store and to make plans to occupy the Property later that year. Sigg volunteered to store the approximately $170,000 worth of shoes Brown's Shoe had ordered in a storage facility Sigg owned in Park City. Brown's Shoe instead decided to have the shoes shipped to its Grand Junction, Colorado store and then later have them sent to Park City when the Property became available. Brown testified that Partners knew Brown's Shoe was ordering inventory and transferring personnel in reliance on Partners' promises and the BLP. On August 5, 1994, Olch sent a letter to Brown stating his position that the BLP was not a binding agreement, but indicating a willingness to try to work out an agreeable lease with Brown's Shoe. In response, on August 12, 1994, Brown's Shoe's attorney wrote Olch arguing that the BLP was a binding document and indicating a willingness to work out a final lease agreement for the Property.

During the fall of 1994 and early 1995, the parties exchanged correspondences and draft lease agreements for the Property, but never agreed to a final lease document. Brown's

Shoe claimed that Partners' proposed final lease was commercially unreasonable, not proposed in good faith, and contained terms directly contrary to the agreed-upon provisions in the BLP.

On February 26, 1995, Brown's Shoe submitted to Partners a lease Brown's Shoe asserted was consistent with the BLP. Partners never responded to Brown's Shoe's proposals. Accordingly, Brown's Shoe filed this action on April 19, 1995.

Several months after Brown's Shoe filed its complaint, Partners rented the Property to nonparty tenants (the Tenants). The Tenants' leases with Partners contained a higher rental rate and none of the provisions Brown's Shoe had repeatedly claimed were commercially unreasonable and proposed in bad faith.

The trial was scheduled for June 11, 1996. On June 6, 1996, a hearing was held to discuss which issues would be decided by the court and which issues would be decided by the jury. At that time, the judge decided to hold a hearing at the beginning of trial on June 11 to argue and decide various legal matters, including whether Brown's Shoe's claims should go to the jury or be decided by the court and whether there were any disputed material facts concerning those claims. Although Brown's Shoe argues otherwise, both sides understood that the pretrial hearing on June 11, 1996, would effectively be a summary judgment hearing.

Immediately before the trial on June 11, 1996, the hearing was held. After substantial argument, the court dismissed with prejudice Brown's Shoe's claims of specific performance, fraud, and breach of contract to the extent of the two three-year option periods referred to in the BLP. The court reserved the issue of whether the BLP was an enforceable agreement for the initial three-year term and ruled it would submit that issue to the jury.

During this hearing, Brown's Shoe stipulated that the breach of contract claim for the initial three-year term of the lease could

---

**3.** Brown's Shoe's expert, Richard A. Robbins, opined that the BLP was a typical letter of interest which parties use to attempt to obtain financ-

ing and that 50% of the time such documents never result in a final agreement between the parties.

also be dismissed with prejudice, because it was Brown's Shoe's position that if it only had the initial three-year term of the lease it would lose money.[4] Under the stipulation, if it successfully appealed the trial court's dismissal of the breach of contract claim as to the option periods, Brown's Shoe could refile the breach of contract claim as to the initial three-year term. The court accepted the stipulation and entered an order dismissing Brown's Shoe's claims as well as Partners' counterclaims for abuse of process and fraud.

Brown's Shoe filed a timely Notice of Appeal and Partners' filed a timely Notice of Cross Appeal concerning dismissal of their abuse of process counterclaim.

## ISSUES AND STANDARD OF REVIEW

Based on the terms of the two three-year option periods in the BLP, Brown's Shoe argues the trial court erred in concluding the following: (1) the BLP was too vague and indefinite for specific enforcement and for recovering damages; (2) Partners were under no duty to negotiate in good faith ancillary lease terms and option period rents; (3) there was no misrepresentation of a then-existing fact and thus no fraud; and (4) certain facts were undisputed.

Partners raise one issue: whether the trial court erred in dismissing their counterclaim for abuse of process where there was substantial evidence that Brown's Shoe commenced this action for an improper purpose.

After viewing the facts in a light most favorable to the losing party, we will affirm a grant of summary judgment "only if there is no disputed issue of material fact and the moving party is entitled to judg-

ment as a matter of law. We grant no deference to the trial court's conclusions of law and review them for correctness."

*Don Houston, M.D., Inc. v. Intermountain Health Care, Inc.*, 933 P.2d 403, 406 (Utah Ct.App.1997) (citation omitted).

## ANALYSIS

Although the trial court reserved the issue of whether the BLP was an enforceable agreement for the initial three-year term in order to submit it to the jury, Brown's Shoe stipulated that the claim relating to the initial three-year term could be dismissed with prejudice. Under the stipulation, if Brown's Shoe were successful on this appeal with respect to the enforceability of the option periods, it could refile the breach of contract claim as to the initial three-year term.[5]

■ Brown's Shoe first argues the trial court erred in concluding the BLP, insofar as the option periods are concerned, was too vague and indefinite to be specifically enforced. We disagree.

The BLP, on its face, is an agreement to agree. The first paragraph states that the terms within the BLP are "to be incorporated into a final lease document executed by both parties." Additionally, the BLP did not specify the percentage rental that Brown's Shoe would have to pay during the option periods or any mechanism for determining that rental amount. The rental amount that Brown's Shoe would pay during the option periods was left for future agreement—a sort of agreement to agree within an agreement to agree. Thus, the dispositive issue is whether the agreement to agree in this case,

---

4. Brown's Shoe required a final binding agreement for two three-year option periods to lease the Property. At the hearing at the start of trial, Brown's Shoe stipulated that the following deposition testimony of Tom Brown was true and accurately reflected Brown's Shoe's position:

Q. So I take it that at the end of the day you were prepared to sign a lease if all the term was, was three years, no options; is that true?
A. No.
Q. In order to sign a lease you required at least two option periods of three years each?
A. Yes.
....
[By plaintiff counsel]: Go ahead.

A. [By Brown] No, I wouldn't have done it strictly on three years.
Q. [By defense counsel] I just ask, why not?
A. Because if you need to depreciate your items and this sort of thing, you don't even get a run at it in three years.
Q. So you would end up losing money?
A. Losing money.

5. This notwithstanding, at oral argument Brown's Shoe suggested its desire to enter into the final lease agreement in accordance with the terms of the BLP and to rely upon the covenant of good faith and fair dealing to reach agreement on the additional rent to be paid thereunder.

i.e., the BLP or more specifically the option periods of the BLP, includes terms definite and clear enough to be specifically enforced. Put another way, we must determine whether the terms of the BLP, specifically those of the two option periods, are incorporated into a final agreement.

■ An agreement to agree, by reason of its character, is not, per se unenforceable. *See Chu v. Ronstadt,* 17 Ariz.App. 486, 498 P.2d 560, 563–64 (1972); *Harmon v. Greenwood,* 596 P.2d 636, 639 (Utah 1979); *Johnson v. Star Iron & Steel Co.,* 9 Wash.App. 202, 511 P.2d 1370, 1373–74 (1973). To the extent an agreement to agree contains provisions otherwise capable of enforcement, the fact that the parties contemplate incorporating those provisions into a subsequent agreement does not necessarily render the agreement to agree unenforceable.

> [A] contract will not be prevented from ... operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof. If all the conditions of the postponed writing are specified in such agreement, it is an agreement *in praesenti,* and as such becomes immediately enforceable. But where the conditions of the deferred contract are not set out in the provisional one, or where material conditions are omitted, it is not a contract *in praesenti* because the minds of the parties have not met and may never meet.

*Chu,* 498 P.2d at 563. Unless otherwise provided therein, the agreement to agree is subject to the same analysis that would apply to any other contract with one additional step: Would enforcement of the agreement to agree result in a final agreement which would be unenforceable?

"In interpreting a contract, we determine what the parties intended by examining the entire contract and all of its parts in relation to each other, giving an objective and reasonable construction to the contract as a whole." *G.G.A., Inc. v. Leventis,* 773 P.2d 841, 845 (Utah Ct.App.1989); *accord Western Sur. Co. v. Murphy,* 754 P.2d 1237, 1240 (Utah Ct. App.1988). "Where questions arise in the interpretation of an agreement, the first source of inquiry is within the document

itself. It should be looked at in its entirety and in accordance with its purpose. All of its parts should be given effect insofar as that is possible." *Big Cottonwood Tanner Ditch Co. v. Salt Lake City,* 740 P.2d 1357, 1359 (Utah Ct.App.1987) (citation omitted).

■ The lease contemplated by the parties was for a period of more than one year. Thus, the lease was required to be in writing under the statute of frauds. *See* Utah Code Ann. § 25-5-3 (1995). "[T]he essential parts of a lease to establish validity under the statute of frauds are: (1) the identity of the property, (2) the agreed term, i.e., time period, and (3) the rental amount (rate) and time and manner of payment." *English v. Standard Optical Co.,* 814 P.2d 613, 616 (Utah Ct.App.1991).

> A binding contract can exist only where there has been mutual assent by the parties manifesting their intention to be bound by its terms. Furthermore, a contract can be enforced by the courts only if the obligations of the parties are set forth with sufficient definiteness that it can be performed.

*Bunnell v. Bills,* 13 Utah 2d 83, 86, 368 P.2d 597, 600 (1962) (footnote omitted), *overruled in part on other grounds by Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 302–04 (Utah 1982); *accord Southland Corp. v. Potter,* 760 P.2d 320, 322 (Utah Ct.App.1988). Similarly, for an agreement to agree to be specifically enforced, it must include sufficiently definite terms and conditions. *Cf. Reed v. Alvey,* 610 P.2d 1374, 1378–79 (Utah 1980). The *Reed* court stated:

> There is no principle in equity that demands all the terms of the contract must be set forth in the written agreement. Rather, although an agreement is uncertain or incomplete in some respects, its specific enforcement may nevertheless be decreed where the uncertainty relates to matters which the law makes certain or complete by presumption, rule or custom, or usage.... When the major aspects of a contract are specified with requisite certainty, this Court will not allow incidental

details . . . in a contract . . . to deny specific performance.

*Id.*

Without deciding the issue, we will assume for purposes of review of the option periods that the initial lease period in the BLP was enforceable. The initial period included all the essential elements of a lease: the identity of the Property, the agreed term, and the rental amount. As set forth above, very few points of mutual agreement are necessary to create a valid lease. *See C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 52 (Utah Ct.App.1995) (stating, " 'It is not necessary that the contract itself contain all of the particulars of the agreement. The crucial question is whether the parties agreed on the *essential* terms of the contract.' " (Emphasis added.) (Citation omitted.)).

However, unlike for the initial period, the BLP did not specify the percentage rental that Brown's Shoe would have to pay or any mechanism for determining the rental amount for the option periods. Thus, one of the essential elements of a lease was missing and left open for future negotiation. Accordingly, we must determine if the lack of a price term in the option periods is fatal to their enforceability.

■ In Utah, the law is settled that an option to renew a lease is unenforceable unless the rent to be paid, or some mechanism for determining the amount of rent, is specified in the lease. In *Pingree v. Continental Group of Utah, Inc.*, 558 P.2d 1317 (Utah 1976), the lessee had an option to renew a lease at a rate to be determined based upon specific factors. *See id.* at 1320. The parties were not able to agree on the amount of rent for the option period. *See id.* at 1321. The Utah Supreme Court held that because there was no agreement between the parties on the rental rate for the renewal term, the lease terminated:

> "The majority rule, in essence, is that a provision for the extension or renewal of a lease must specify the time the lease is to extend and the rate of rent to be paid with such a degree of certainty and definiteness

that nothing is left to future determination. If it falls short of this requirement, it is not enforceable."

*Id.* at 1321 (citation omitted).[6]

The holding of *Pingree* has been upheld twice by the Utah Supreme Court in *Cottonwood Mall Co. v. Sine*, 767 P.2d 499 (Utah 1988), and recently in *Richard Barton Enterprises., Inc. v. Tsern*, 928 P.2d 368 (Utah 1996). In *Cottonwood Mall*, the tenant tried to enforce an alleged oral agreement by the landlord to renew a lease "upon reasonable terms." 767 P.2d at 500. The court refused to enforce the oral agreement, stating:

> We held [in *Pingree* ] that the option to renew was too vague and indefinite to be enforceable and that the lease terminated at the end of the original term. . . . In so ruling, this Court followed what was termed the majority rule. . . . In reversing the trial court, this Court expressly rejected its attempt to fix a reasonable rent for the parties when their negotiations bogged down.

*Id.* at 502. The court further elaborated on the role of the courts in commercial negotiations by stating, "Courts simply are not equipped to make monetary decisions impacted by the fluctuating commercial world and are even less prepared to impose paternalistic agreements on litigants." *Id.*

In *Tsern*, the parties to a lease traded proposals for a rent abatement because an elevator in the leased premises was inoperable. *See* 928 P.2d at 371. The trial court determined that although the parties had not agreed on the amount of an abatement, it could fix a reasonable amount because the parties had agreed to the concept of rent abatement. *See id.* at 372. The supreme court reversed, stating, "Modification of such terms as the amount of rent must be agreed upon in a modification of a lease agreement. As Corbin notes, when parties have not agreed on a reasonable price or a method for determining one, 'the agreement is too indefinite and uncertain for enforcement.' " *Tsern*, 928 P.2d at 373–74 (quoting Joseph M. Perillo et al., *Corbin on Contracts* § 4.3, at

---

**6.** Brown's Shoe contends that the rule of *Pingree* is outdated. However, *Pingree* is still good law

in Utah and Brown's Shoe has not convinced us otherwise.

568 (rev. ed. 1993), and citing *Pingree,* 558 P.2d at 1321).

Thus, we follow the holdings of *Pingree, Cottonwood Mall,* and *Tsern* and hold that the lack of a rental term or a mechanism for determining the rental term in the two option periods makes the BLP too vague and indefinite for specific enforcement.[7]

■ Brown's Shoe also argues the trial court erred in dismissing its "claim for damages with respect to the option periods arising out of the alleged breach of the [BLP]." The trial court found this claim invalid because, "even if the [BLP] document was intended to be a binding agreement, [Brown's Shoe] had no enforceable right to lease the Property during the two option periods." We agree with the trial court.

■ We recognize that in some cases, although the terms of a contract are not certain enough to be specifically performed, the terms may be certain enough to provide the basis for calculating damages.[8] Although Brown's Shoe does not directly say so, it seems to argue for special damages or those based upon the doctrine of promissory estoppel. These damages, Brown's Shoe suggests, are based primarily upon its reliance on the terms of an agreement we have determined are unenforceable.

Special damages are "those damages which arise from the special circumstances of the case. They have been said to be such damages as, by competent evidence, are directly traceable to failure to discharge a contractual obligation." The supreme court emphasized that special damages must be foreseeable at the time of contracting. "Mere knowledge of possible harm is not enough; the defendant must have reason to foresee, as a probable result of the breach, the damages claimed.

Furthermore, before *reliance damages* may be awarded, the amount of the expenditure must be found to have been *reasonably* made."

*Saunders v. Sharp,* 840 P.2d 796, 809 (Utah Ct.App.1992) (emphasis added) (citations omitted) (quoting *Ranch Homes, Inc. v. Greater Park City Corp.,* 592 P.2d 620, 624 (Utah 1979)). Whether "reliance damages" are founded on promissory estoppel, characterized as special damages, or otherwise, the reliance must be *reasonable.* Here, reliance on the enforceability of the option provisions is not reasonable.

Brown's Shoe clearly relied on its expectation that the BLP would evolve into a nine-year lease. Brown's Shoe specifically stipulated that Tom Brown would not have agreed to lease the Property for only three years and that he required a lease containing at least two option periods of three years each. Based upon that stipulation, Brown's Shoe then moved for a dismissal of its claim of breach of the BLP for the initial three-year term, thereby implying that Tom Brown's intention for the lease was nine years or nothing. In reliance on the BLP and its negotiations with Partners, Brown's Shoe spent money preparing for the prospective store, e.g., buying and then storing about $170,000 worth of shoes. However, we hold that Brown's Shoe may not claim such expenses as reliance damages because any reliance on the option periods and a nine-year lease was unreasonable in light of the vagueness and uncertainty of the option periods' rental price terms.

■ Brown's Shoe next argues that the BLP invoked the covenant of good faith and fair dealing.

---

7. Because we hold that the BLP may not be specifically enforced, we have no need to address the issue of whether the Tenants were indispensable parties in this action.

8. One of the fundamental requirements for the enforceability of a contract is that its terms be certain enough to provide the basis for giving an appropriate remedy. See § 33. If this minimum standard of certainty is not met, there is no contract at all. It may be, however, that the terms are certain enough to provide the basis for the calculation of damages but not certain enough to permit the court to frame an order of specific performance or an injunction and to determine whether the resulting performance is in accord with what has been ordered. In that case there is a contract but it is not enforceable by specific performance or an injunction.
Restatement (Second) of Contracts § 362 cmt. a (1981).

In this state, a covenant of good faith and fair dealing inheres in most, if not all, contractual relationships.... Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract. A violation of the covenant gives rise to a claim for breach of contract. *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199–200 (Utah 1991) (citations omitted); *see also Olympus Hills Shopping Center, Ltd. v. Smith's Food & Drug Centers, Inc.*, 889 P.2d 445, 450 n. 4 (Utah Ct.App.1994) ("It is fundamental that every contract includes a covenant of good faith and fair dealing with respect to dealings between the parties."). There is no reason why an enforceable agreement to agree does not give rise to the covenant of good faith and fair dealing.

Brown's Shoe contends that it "was justified in its expectations that [Partners] would enter into good-faith negotiations (1) for a lease incorporating the agreed-upon terms in the [BLP]; and (2) to establish the rental rate for each option period."

In *Ferris v. Jennings*, 595 P.2d 857 (Utah 1979), the Utah Supreme Court affirmed the specific enforceability of an oral contract in which the *only* term fixed was the purchase price. *See id.* at 858. Among other omissions, the contract specified neither the time for payment nor the amount of a commission to be paid to the seller. *See id.* In concluding that none of these omissions was a bar to specific performance, the Utah Supreme Court held:

> We have no disagreement with the general proposition that a contract will not be specifically enforced unless the obligations of the parties are "set forth with sufficient definiteness that it can be performed." But to be considered therewith is the further proposition that *the parties to a con-*

> *tract are obliged to proceed in good faith to cooperate in performing the contract in accordance with its expressed intent. A contract is not fatally defective as to price if there is an agreement as to some formula or method for fixing it.*

*Id.* at 859 (footnote omitted) (emphasis added). Thus, we conclude that, even if the BLP invoked an obligation by the parties in this case to enter into the final lease agreement and to proceed in good faith to negotiate the rental price term and other undecided lease terms, the option periods of the BLP were fatally defective as to price because, as we held above, the option periods included no sufficiently certain "agreement as to some formula or method for fixing [the rental price]." *Id.* Indeed, the application of the covenant of good faith and fair dealing to the parties' agreement to agree in this case underscores the reason why open-ended price terms under certain agreements are unenforceable: the parties could negotiate in good faith indefinitely and *never* agree upon the price term.

■■■ Third, Brown's Shoe contends that Partners committed fraud by misrepresenting their intent to be bound by the terms of the BLP when they signed it.[9] Brown's Shoe asserts that to induce it to sign, Partners represented, contrary to their then-existing intentions, that they intended to honor the terms of the BLP. Brown's Shoe further asserts that Partners entered the BLP solely to use it to obtain financing.

The trial court found that both parties contemplated that before Brown's Shoe occupied the Property a final lease document would be executed, which would incorporate the terms agreed upon in the BLP. The trial court then concluded as a matter of law that Brown's Shoe's fraud claim was insufficient because there was no misrepresentation

---

9. The elements of fraud are well-established: (1) a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation; (5) for the purpose of inducing that other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to that party's injury and damage. *Turner v. General Adjustment Bureau, Inc.*, 832 P.2d 62, 66 (Utah Ct.App.1992).

of a presently existing fact.[10]

We agree with the trial court and hold that there is no basis for any contention that at the time the parties entered into the BLP, Partners did not intend to attempt to negotiate a final lease incorporating the terms of the BLP. The fact that Partners may have intended to use the BLP to obtain financing is irrelevant. Brown's Shoe was well aware of that fact. Brown's Shoe's own expert testified that such a document is often used to obtain financing and that fifty percent of the time such a preliminary document does not result in a final agreement.

Fourth, Brown's Shoe argues the trial court erred in concluding certain facts were undisputed. We disagree and hold that the trial court's determinations were fully supported by the record, which included undisputed documents and Tom Brown's own testimony.[11]

■ Finally, Partners argue that the trial court erred in dismissing their counterclaim for abuse of process. Partners contend that Brown's Shoe filed this lawsuit despite the fact that Brown's Shoe knew it was not willing to abide by the terms of the BLP. In support of this contention, Partners assert that Brown's Shoe knew it was not willing to lease the Property for the initial three-year term unless it had a firm agreement as to the rent to be charged during the two three-year option periods. Partners also claim that

Brown's Shoe filed this lawsuit to try to force Partners to lease Brown's Shoe the Property or to pay Brown's Shoe "blood money" to settle the lawsuit.

We agree with Brown's Shoe's contention that Partners' claim is for "malicious prosecution or wrongful bringing of civil prosecution," [12] rather than "abuse of process." "An action challenging the initiation of a lawsuit is an action for malicious prosecution or for wrongful bringing of civil proceedings, and not for abuse of process...." *Keller v. Ray, Quinney & Nebeker,* 896 F.Supp. 1563, 1570 (D.Utah 1995), *aff'd,* 78 F.3d 597 (10th Cir. 1996). The trial court expressly determined that, as a matter of law, Brown's Shoe's legal position did not exhibit a lack of probable cause or a purpose other than securing a proper adjudication of Brown's Shoe's claims. There is nothing in the record suggesting otherwise. Thus, the trial court correctly dismissed Partners' counterclaim.

## CONCLUSION

Because the BLP, insofar as the option periods are concerned, lacked a rental term or a mechanism for determining a rental term, we conclude that the trial court was correct in determining the BLP was too vague and indefinite to be specifically enforceable, even if the BLP invoked an obligation by the parties to proceed in good faith to attempt to reach a final lease agreement

10. The court also concluded Brown's Shoe's fraud claim was insufficient because Brown's Shoe could not have reasonably relied on the claimed misrepresentation and it suffered no damages as a result of the claimed misrepresentation. Because we agree that there was no misrepresentation of a presently existing fact, we need not address these other grounds.

11. We do not reach two other issues argued by Brown's Shoe: (1) whether Brown's General Offices is a party to the contract with Partners and is thus entitled to recover damages for Partners' breach thereof and (2) whether the trial court erred in ruling on Brown's Shoe's equitable claims before the jury had ruled on Brown's Shoe's legal claim based on common facts. We do not reach the first issue because we hold that the option periods of the BLP are unenforceable and Brown's Shoe is entitled to no damages.

Regarding the second issue, because of the parties' stipulation at the pretrial hearing, we are, as a practical matter, presented on appeal

only with the issue of the enforceability of the option periods. If we had held them to be enforceable as a matter of law, the case would have been remanded and upon retrial, the jury would have been permitted to determine "whether the [BLP] was an enforceable agreement." Thus, because we hold that the options were unenforceable, we do not reach this issue.

12. The elements of "wrongful civil proceedings" are detailed in Restatement (Second) of Torts §§ 674–76 (1977). Section 674 provides, in relevant part:

One who takes an active part in the initiation, continuation or procurement of civil proceedings against another is subject to liability to the other for wrongful civil proceedings if

(a) he acts without probable cause, and primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based.

*Id.*

and to negotiate the option period price terms and other ancillary lease terms. Next, because any reliance on the enforceability of the option periods was unreasonable, we conclude that the trial court did not err in ruling that no damages should be awarded. We also agree with the trial court that there is no basis for any contention that Partners committed fraud by misrepresenting their intent to be bound by the terms of the BLP when they signed it. Next, we hold that the trial court did not err in concluding certain facts were undisputed. Finally, because Brown's Shoe's legal position did not exhibit a lack of probable cause or a purpose other than securing a proper adjudication of its claims, we hold that the trial court correctly dismissed Partners' counterclaim. Thus, the orders of the trial court dismissing Brown's Shoe's complaint and Partners' counterclaim are affirmed.

BILLINGS and JACKSON, JJ., concur.